HUGGINS v. CAREY.†

(Court of Civil Appeals of Texas. Ft. Worth. April 20, 1912. Rehearing Denied May 18, 1912.)

1. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—SUFFICIENCY OF PRESENTATION.

Under Court of Civil Appeals Rule 31 (31 S. W. vii), assignments of error to overruling defendant's demurrers and exceptions to the petition are not reviewable where the statements following the assignments do not disclose that the exceptions were called to the trial court's attention and overruled by any order entered of record.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

2. FRAUDS, STATUTE OF (§ 49*) — CONTRACTS NOT TO BE PERFORMED WITHIN A YEAR—MARRIAGE PROMISE.

That defendant promised to marry plaintiff as soon as he could have a suitable home erected and wind up his business affairs does not show a contract not to be performed within one year within the statute of frauds; it not appearing that the event could not take place within one year.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 74; Dec. Dig. § 49.*]

3. BREACH OF MARRIAGE PROMISE (§ 18*)—PETITION—SUFFICIENCY.

A petition stating that defendant proposed marriage with plaintiff and she accepted, that during the continuance of the agreement plaintiff was assiduous in his attentions, giving plaintiff expensive jewelry, money, etc., that he won her love and confidence, and that under reiterated promises of marriage had illicit intercourse with her, etc., is sufficient as a petition for breach of marriage promise, but does not show an agreement for immoral purposes.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 21–25, 48; Dec. Dig. § 18.*]

4. BREACH OF MARRIAGE PROMISE (§ 28*)—DAMAGES—SEDUCTION.

In assessing damages for breach of marriage promise, plaintiff's seduction by defendant may be considered.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 40–43; Dec. Dig. § 28.*]

5. BREACH OF MARRIAGE PROMISE (§ 37*)—APPEAL—HARMLESS ERROR.

In an action for breach of a marriage promise, it was not prejudicial error to permit plaintiff to plead and prove that defendant advised an abortion after seducing her.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 53–55; Dec. Dig. § 37.*].

6. TRIAL (§ 250*)—INSTRUCTIONS—CONFORMITY TO PLEADING AND PROOF.

In an action for breach of marriage promise, an instruction to find for defendant if the contract was not to be performed within one year was properly refused where the statute of frauds was not put in issue by the pleadings or evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 584–586; Dec. Dig. § 250.*]

7. BREACH OF MARRIAGE PROMISE (§ 15*)—LIMITATIONS.

Under the express provisions of Rev. St. 1895, art. 3353, an action for breach of marriage promise is brought in time if brought within one year from the breach.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 17; Dec. Dig. § 15.*]

8. BREACH OF MARRIAGE PROMISE (§ 26*)—DAMAGES—ELEMENTS.

Recovery for breach of marriage promise properly includes plaintiff's consequent distress, humiliation, and loss resulting from defendant's seduction of her and from his refusal to comply with his promise.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 38, 39; Dec. Dig. § 26.*]

9. APPEAL AND ERROR (§ 1064*)—REVIEW—HARMLESS ERROR—INSTRUCTIONS.

In an action for breach of marriage promise, an instruction which assumed that plaintiff had sustained some actual damage was harmless where the evidence established that defendant was wealthy and well able to provide a home, comfort, and luxuries for a wife.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4219, 4221–4224; Dec. Dig. § 1064.*]

10. DAMAGES (§ 1*)—LIABILITY.

One inflicting wrongful injury on another is liable in damages to the extent of the injury.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 1; Dec. Dig. § 1.*]

11. TRIAL (§ 194*)—INSTRUCTIONS—WEIGHT OF TESTIMONY.

An instruction that the burden was on plaintiff to prove her case by a preponderance of the evidence, but that she need not introduce more witnesses than defendant, but that from a consideration of all the evidence it must appear to be more probable that proof was with her more than with defendant, was not improper as indicating the judge's view of the weight of the testimony.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 439–441, 446–454, 456–466; Dec. Dig. § 194.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes
† Writ of error granted by Supreme Court.

**12. DAMAGES (§ 216*)—INSTRUCTIONS—DOUBLE DAMAGES.**

An instruction that the measure of plaintiff's recovery was compensation for defendant's breach of promise to marry her, including injury to her feelings, affection, and pride, as well as the loss of marriage, and that, if under the promise he seduced her and a child was born, she could recover such other damages as she sustained thereby, was erroneous as authorizing the assessment of double damages.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 548–555; Dec. Dig. § 216.*]

**13. APPEAL AND ERROR (§ 1140*)—DISPOSITION OF CAUSE—REMITTITUR.**

In an action for breach of marriage promise, error in an instruction which authorized double damages on account of seduction does not require reversal of the judgment where the jury segregated the damages awarded for the seduction from the other damages; remittitur of the special damages being properly required.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4462–4478; Dec. Dig. § 1140.*]

**14. NEW TRIAL (§ 108*)—NEWLY DISCOVERED EVIDENCE.**

Defendant in an action for breach of marriage promise is not entitled to a new trial, on the ground of newly discovered evidence controverting plaintiff's claim that a child was born through her seduction by defendant, where the testimony is of inconclusive character and defendant was not diligent in procuring it.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 226, 227; Dec. Dig. § 108.*]

**15. NEW TRIAL (§ 108*)—NEWLY DISCOVERED EVIDENCE.**

Defendant in an action for breach of marriage promise is not entitled to a new trial on the ground of newly discovered testimony tending to show improper conduct between plaintiff and other men during the engagement, where the testimony is inconclusive and neither defendant's pleadings nor proof attacked plaintiff's virtue except as to her relations with defendant.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 226, 227; Dec. Dig. § 108.*]

**16. TRIAL (§§ 140, 168*)—PROVINCE OF JURY—DIRECTION OF VERDICT.**

In jury trials, the jury are the exclusive judges of the credibility of the witnesses and of the weight of their testimony, and a verdict cannot be directed unless the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn therefrom.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 334, 335, 376–380; Dec. Dig. §§ 140, 168.*]

**17. BREACH OF MARRIAGE PROMISE (§ 34*)—BONA FIDES OF ENGAGEMENT—JURY QUESTION.**

In an action for breach of marriage promise, *held*, under the evidence, a jury question whether the engagement was bona fide or for immoral purposes only.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 50; Dec. Dig. § 34.*]

**18. BREACH OF MARRIAGE PROMISE (§ 31*)—DAMAGES—EXCESSIVENESS.**

Thirty-five thousand dollars was not excessive recovery for breach of marriage promise involving seduction, where plaintiff was without means, and defendant was 62 years old, with apparently no relatives depending on him, and was worth about $200,000.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 47; Dec. Dig. § 31.*]

**19. EVIDENCE (§ 61*)—PRESUMPTIONS—GOOD MORAL CHARACTER.**

In the absence of proof to the contrary, plaintiff in a suit for breach of marriage promise is presumed to have been a woman of good moral character.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 82; Dec. Dig. § 61.*]

Appeal from District Court, Clay County; P. A. Martin, Judge.

Action by Mrs. Clara T. Carey against J. L. Huggins. Judgment for plaintiff, and defendant appeals. Reformed and affirmed conditionally.

Allen & Allen, of Henrietta, W. O. Davis, of Gainesville, and McLean, Scott & McLean, of Ft. Worth, for appellant. R. E. Taylor, of Henrietta, and Hunter & Hunter, of Ft. Worth, for appellee.

CONNER, C. J. This appeal is from a judgment in appellee's favor for $35,000 actual, and $10,000 special, damages for a breach of a contract of marriage. Substantially the case as presented by appellee's petition and evidence is that, after a preliminary meeting, acquaintance, and an association of several months, J. L. Huggins on the 25th day of December, 1906, proposed marriage with appellee, and she accepted, no specific date for the marriage being fixed; that the promised relation of husband and wife continued until January 1, 1911, when appellant openly declined to further recognize or comply with his agreement to marry appellee; that during the continuance of the agreement appellant was assiduous in his attentions, making gifts of expensive jewelry and of various sums of money, and completely won appellee's trust, love, and confidence; and that, yielding thereto and to appellant's earnest and repeated solicitations and reiterated promises of marriage, she in September or October, 1907, and at various times thereafter, engaged in illicit carnal intercourse with appellant, thereby in March, 1908, conceiving a girl child, which was born in the state of California December 14, 1908.

Appellant answered by general and special exceptions, by a general denial, and specially that the illicit intercourse charged, which was admitted, was attained, not by any promise of marriage which was particularly denied, but in consideration of jewelry and some $6,000 or $7,000 in money from time to time advanced to appellee; the paternity of the child also being specially denied.

Appellant's testimony fully supports his answer to the merits, but the jury returned their verdict in appellee's favor for damages as awarded by the judgment appealed from.

The evidence consists of the testimony of

the two parties to the suit, together with numerous letters passing between them, and not a bill of exception is to be found in the record; appellant now complaining of the action of the court in giving and refusing charges, that the evidence is insufficient to support the verdict and judgment, and that both are excessive.

[1] Disposing of the questions presented in the inverse order of their importance or difficulty, rather than in that of their presentation, we will first observe that we find nothing demanding extended notice of those assignments asserting that error was committed in overruling appellant's demurrers and exceptions to appellee's petition. The statements following these assignments fail to disclose that the exceptions were in fact called to the court's attention and overruled by any order entered of record, and hence it cannot be said that the presentation manifests error. Rule 31 for the Court of Civil Appeals (31 S. W. vii); Cage v. Tucker's Heirs, 25 Tex. Civ. App. 48, 60 S. W. 579; Tex. & Ft. S. Ry. Co. v. Spencer, 28 Tex. Civ. App. 251, 67 S. W. 196; Hopson v. Schoelkopf, 27 S. W. 283; Huddleston v. Kempner, 1 Tex. Civ. App. 211, 21 S. W. 946; City of Cooper v. Ward, 68 S. W. 297.

[2] Moreover, should the objection noted be disregarded, the exceptions seem to be without substantial merit. The appellee's petition on its face fails to affirmatively show that the contract of marriage was oral and not to be performed within a year, and hence the pleading fails to show that it is within the statute of frauds. The allegations are that appellant promised to effectuate the marriage as soon as he could have a suitable home erected and so wind up his business affairs as that he could quit labor, take a vacation, wedding trip, etc., and it does not appear from the petition that this could not have been done within the year. See Thouvenin v. Lea, 26 Tex. 612; Thomas v. Hammond, 47 Tex. 42; W., M. W. & N. W. Ry. Co. v. Wood, 88 Tex. 191, 30 S. W. 859, 28 L. R. A. 526, and authorities therein cited.

[3] Nor is there greater force in the exception to the effect that it appears from the petition that the agreement of marriage appears to have "been made and relied upon for immoral purposes," etc. True immorality is exhibited, but as an element of damages only; it being specifically averred that the contract long preceded the illicit intercourse and that the latter was based upon the former instead of the reverse.

[4] The further exception that the petition is insufficient in that it seeks damages for seduction is clearly not maintainable. The gravamen of the petition is plainly the breach of the contract of marriage, and in such cases it is well settled that in assessing the damages the fact of the plaintiff's seduction by the defendant may be taken into consideration. See 5 Cyc. 1021, and authorities cited in note 77.

[5] The exception to the allegation that appellant advised an abortion when appellee's condition was first ascertained would appear not to have been regarded seriously. No objection was made to appellee's testimony to the same effect, which appellant freely denied, and the allegation and evidence is susceptible of a construction favorable to appellant in that it might be argued that such advice was inconsistent with the relation of promised husband and wife and more natural and probable in case of the illicit relation alleged and sworn to by appellant. For aught that appears to the contrary, such use of appellee's testimony on the point may have been made before the jury, but whether so or not, in the condition of the record, we find no prejudicial error in the matter.

[6] Special charge No. 2, to the effect that, if the jury should find that the contract of marriage was not to be performed within one year from its making, the verdict should be for the defendant, was properly refused inasmuch as in our opinion the statute of frauds was not put in issue by either the pleading or the evidence. Other than by exception which we have disposed of, appellant had no such plea, and appellee's evidence and allegations were substantially the same, so that no basis for such a charge existed for the reasons and upon the authorities stated by us in disposing of appellant's exception on the subject.

[7, 8] The special charge that the jury could not "consider any proof, if any, of any seduction in this case prior to January 1, 1911," is evidently founded upon the erroneous idea that appellee's cause of action was based upon the seduction, and that hence limitation began to run from its occurrence. The contrary is true, however. The action is clearly predicated upon the breach of the marriage contract, which, as alleged and shown by appellee's testimony, took place within a year of the institution of the suit, and was therefore not within Revised Statutes, art. 3353, prescribing a limitation of one year for this character of action. The cause of action not being barred, none of the natural and proximate consequences of the breach of the contract were. These included distress, humiliation, and loss arising out of the seduction and resulting alone from the refusal of appellant to comply with his marriage agreement. Until the breach of contract, no such element of damage arose, and the court ruled correctly in rejecting the charge.

[9] The charges given are assailed in several particulars. It is objected that the court assumed that appellee sustained damages by reason of appellant's refusal to comply with his promise of marriage; the insistence being that the issue should have been submitted to the jury. This objection

is based upon the following paragraph of the court's charge: "If you believe from the evidence that the defendant promised and agreed to marry the plaintiff, and that she in turn promised to marry him, and that they became on December 25, 1906, engaged to be married, and that afterwards at various times she requested the defendant to marry her, and that defendant continued to promise to marry her, and that he never refused to do so until in January, 1911, and that he then did refuse to marry her, then I instruct you that the plaintiff is entitled to recover from the defendant all such actual damages as she has sustained by reason of said engagement to marry and defendant's refusal to consummate the same. The measure of damage in this case is compensation to the plaintiff for the breach of promise to marry her, which includes all damages sustained by her on account of injury to her feelings, affection, and wounded pride, as well as the loss of the marriage with the defendant."

While the charge assumes, as objected, that some actual damages would follow from the facts submitted if found to be true, this, if not so as a matter of law, is at least harmless under the circumstances of this case. In deference to the verdict of the jury, we must accept as established that appellant made and breached the contract of marriage as alleged, and the evidence otherwise shows without dispute that appellant is a man of wealth and well able to provide a home, comfort, and luxuries for a wife. All of this appellee certainly lost as a direct result of appellant's refusal to marry her, and that this constitutes actual damages can, it seems to us, admit of no doubt.

[10] The general rule of law is that whoever does a wrongful injury to another is liable in damages to the extent of that injury, and it has often been held that it does not constitute error for the court in his charge to assume an undisputed fact. See the numerous cases cited at pages 102, 103, 10 Encyc. Dig. of Tex. Rep. (Civ.). There is no error in the charge therefore. But if it be admitted that the issue of whether appellee suffered actual damage should have been submitted to the jury, and that in this respect the charge is technically erroneous, it is altogether improbable that appellant thereby suffered any injury. No amount of damage was indicated by the charge, and the jury not only found actual damages, but found such damages in a large amount, so that it would seem extremely technical to reverse the judgment and remand the cause for a new trial merely to enable a jury to say by their verdict whether appellee suffered injury and actual damage by reason of the breach of contract established by the verdict. See Carter v. Eames, 44 Tex. 544; Smith v. Miller, 66 Tex. 74, 17 S. W. 399;

Hill v. Houser, 51 Tex. Civ. App. 359, 115 S. W. 112.

[11] The court's charge on the burden of proof reads: "The burden of proof is upon the plaintiff to establish her case by a preponderance of the evidence, but by this you are not to understand that the plaintiff is required to introduce a greater number of witnesses than the defendant, but only upon consideration of all the evidence introduced by both of the parties it must appear to you more probable that the proof upon the necessary facts to a recovery is with the plaintiff more than with the defendant."

The only proposition asserted under the assignment objecting to this charge is that "the court should never, in his charge, by implication or otherwise, indicate his view of the weight of the testimony." Just how this charge indicated the court's view "of the weight of the testimony" is not very apparent. It seems to have been particularly appropriate inasmuch as but two witnesses testified in person on the trial—one was appellee and the other appellant. Appellant was as emphatic in his denial of the material facts as was appellee in affirming them, and it is at least supposable that a jury in a given case might under such circumstances infer from the ordinary charge on the burden of proof that the plaintiff had not established her case by a preponderance of evidence. The jury in this case was before the trial judge, and we cannot say that the charge was erroneous or harmful, particularly in view of the fact that the charge given seems to have been quoted from a charge receiving at least the general approval of our Supreme Court in the case of Mo. Pac. Ry. Co. v. White, 80 Tex. 202, 15 S. W. 810, 811.

[12] Appellant also assigns error to the following portion of paragraph two of the court's charge, viz.: "The measure of damage in this case is compensation to the plaintiff for breach of promise to marry her, which includes all damages sustained by her on account of injury to her feelings, affection, and wounded pride, as well as the loss of the marriage of the defendant. And if you further believe that by reason of such promise to marry her, if such was made by the defendant, he seduced her and begot her with child, and that child was born of said seduction, then you may add to said sum such other and further damages as in your sound discretion you believe she has sustained by reason of such seduction, and by reason of the disgrace and humiliation she has thereby sustained, if any."

We think this charge is objectionable in that it authorizes the assessment of double damages. The actual damages recoverable for the breach of a marriage promise are such as will compensate the plaintiff for the benefits lost by the breach and the men-

tal distress and humiliation occasioned thereby, including distress occasioned by the seduction. Say our Supreme Court in Daggett v. Wallace, 75 Tex. 353, 13 S. W. 49, 16 Am. St. Rep. 908: "The policy of the law, it seems, refuses to recognize the right of the female seduced to recover solely for the seduction; and this is upon the principle that she is not entitled to satisfaction from her partner in crime for a supposed injury to which she consents. But, while this may not afford a separate and distinct ground of recovery, it is settled by the great majority of cases that, in an action for the breach of a promise of marriage, such seduction, if alleged and proved, is proper to be considered in estimating the damages"—citing Sherman v. Rawson, 102 Mass. 399; and 3 Suth. on Dam. 316. Of the same general effect is the statement in 5 Cyc. 1021, subd. c, citing many authorities. The reason for this, say our Supreme Court in the case from which we last quote, "is that it cannot be fairly ascertained to what extent the plaintiff is damaged by the breach of the contract or promise without considering the condition in which she is left by the defendant's conduct which is complained of." Daggett v. Wallace, 75 Tex. 355, 13 S. W. 50, 16 Am. St. Rep. 908.

It seems clear from these authorities that the first complete sentence or subdivision of the charge quoted is in terms broad enough to authorize the jury in determining the amount of damages to award compensation, not only for the loss of a beneficial marriage, but also for all injury to her feelings, affection, and wounded pride, which, it seems, must necessarily include mortification and wounded pride caused by the fact of seduction. There was no necessity therefore—indeed it may have been misleading—to further authorize the imposition of the additional damages provided for in the second subdivision of the charge.

[13] The error here noted, however, will not necessarily work a reversal of the judgment inasmuch as the objectionable feature of the charge is limited to the damages arising from the seduction, and these have been by the jury segregated from all other damage in their verdict. A remittitur, therefore, of the special damages of $10,000 specified in the verdict will manifestly remove any probable injury to appellant, and such remittitur will be required.

[14] Appellant's fifteenth assignment of error is as follows: "The court erred in not sustaining defendant's motion for a new trial because of the newly discovered evidence therein set forth, which evidence is and was material, and was not and could not be discovered prior to the trial because of plaintiff's willful concealment of times, names, and places."

Appellee testified that she was confined in Los Angeles, Cal., "at 310 Hill street," which was the address of Mrs. Ella Martin, the nurse who attended her; that the physician who waited upon her was a "Dr. C. H. Wells," whose address was 520 something Spring street." She further testified that the child was born on the 14th of December, 1908, and that she returned to Texas about the middle of January following, leaving the baby in California for the reason that she did not want her mother to know of it. It further appears that appellee declined to answer ex parte interrogatories propounded to her soon after the institution of her suit calculated to elicit the information above stated; the reason assigned on the trial therefor being that Mr. Huggins had threatened to take the child and she was unwilling for him to take it with him and leave it at the ranch with a woman that he had there, and the newly discovered evidence to which the assignment above copied relates is, first, an affidavit of one Charles W. Hatton made on the 23d of May, 1911, to the effect that he was a resident of the city of Los Angeles, Cal., and had diligently inspected the records of that city in the office of the health department, and that the record of physicians and surgeons therein failed to show the name of C. H. Wells, or that there was any "physician or surgeon by the name of C. H. Wells registered to practice medicine in the office of the health department of the city of Los Angeles; that the only physician registered in the office of the health department of the city of Los Angeles by the name of Wells on the 14th day of December, 1908, is one H. L. Wells, whose place of residence is San Diego, Cal." Second, a written statement in the form of a report dated May 22, 1911, by one John P. Elms, of the Elms Detective Agency, to the effect that he had not been able to find any woman by the name of "Ella Martin" who had ever resided at "No. 310 North Hill street" in Los Angeles, Cal., nor had he been able to find any such named woman at number "357 South Hill" or at several other places on other streets named by him.

Upon the submission of this cause before us, and in appellant's brief and written arguments, it is contended that appellee's testimony of the birth of the child is a fabrication and that the proof of this fact must be necessarily very material. As treated by the trial court and jury, the birth of the child, if any, was evidently considered, if at all, as a mere circumstance in determining the amount of damages, most probably that which is denominated by the verdict as special damages and which has been eliminated by our holding on one of the objections to the charge. Save in some such indirect way, the birth of the child cannot be material to the important issues of whether there was a contract of marriage and whether it had been breached. But, regardless of the real relation of the birth of the child to the case,

the purported newly discovered testimony, if given its greatest effect, is in its nature merely an impeachment of appellee's testimony on the same subject. Moreover, such newly discovered testimony as presented seems of a very inconclusive character. The report of the detective is not sworn to by the declarant, nor does the record exclude the fact, as testified to by the appellee, that there was a 310 Hill street, nor does it appear otherwise than inferentially that at the date of the birth of appellee's child the laws of the state of California required the registration of births or deaths or of the names of practicing physicians. Nor does the testimony exclude the possibility that the physician who waited upon her was a visitor to Los Angeles, perhaps living in some one of the northern cities of that state.

The jury in the trial court had before them the fact of appellee's refusal prior to the trial to give the particulars of her confinement and residence in California, together with her explanation therefor, and we cannot think the newly discovered evidence as presented is of such force and effect as to show an abuse of the court's discretion, or to probably bring about a different result upon another trial. Moreover, we think appellant's diligence in procuring this information wholly insufficient. The testimony shows that appellee wrote to appellant a number of times while she was in Los Angeles, and that on one occasion appellant sent a letter to her at that point, inclosing exchange for money; that on more than one occasion appellee had requested appellant to go with her and see the child, the birth of which it appears he accepted until some time in 1909, when he says for the first time he made up his mind that no such child existed. From this time until the institution of the suit, which was on April 4, 1911, appellant could, had he deemed it material, have made the investigation finally attempted. Such investigation could certainly have been made between the date of the institution of the suit and the date of the trial, which was on May 17, 1911. Nor was there when the trial began any suggestion on appellant's part that he desired a continuance in order to procure this or any other testimony, notwithstanding the fact that the allegations of appellee's petition fully informed him that the birth of a child would be claimed. In addition to this, during the trial and after appellee had by her testimony given the place of confinement and the names of the attending nurse and physician, appellant might then have withdrawn his announcement and perhaps have secured a continuance for the purpose of procuring the testimony he now seeks to have submitted to another jury, but no such suggestion was made. On the contrary, it would seem that appellant deliberately took his chances with the jury, speculating upon a favorable result, and he cannot now complain. Madden v. Shapard, 3 Tex. 49; Edrington v. Kiger, 4 Tex. 89, 90; G., C. & S. F. Ry. Co. v. Blanchard, 96 Tex. 616, 75 S. W. 6.

[15] Appended to the motion for new trial —to which our attention is also called in appellant's brief—is an affidavit of a Mrs. Katie Green stating circumstances possibly tending to show improper conduct on appellee's part with other men during the year 1907 and until the summer of 1908, but we think no importance should be given to this affidavit. It is inconclusive in character, and no effort whatever was made in appellant's pleadings or upon the trial to assail the virtue or good character of appellee otherwise than from the facts to which she and appellant both testified. It is undisputed that for several years appellant frequently visited appellee at her several boarding places in the city of Ft. Worth, and both appeared to have had mutual acquaintances. Appellant's letters to and association with appellee—to be hereinafter more fully referred to—during the period covered by the affidavit of Mrs. Katie Green seems inconsistent with a belief on appellant's part that appellee was promiscuously lewd. Besides this alleged newly discovered evidence seems not to be comprehended within the assignment copied, or, if so, it is altogether inconceivable, had the conduct and character of appellee been as appellant now seeks to impute and had he desired to make this issue upon the trial, that the slightest diligence on his part would not have enabled him not only to get the testimony of Mrs. Green, but also other abundant testimony in support of the charge.

[16, 17] It is most earnestly contended that the court erred in refusing to give appellant's special charge No. 1 which reads, "You are instructed to find a verdict in favor of the defendant"; the proposition and insistence being that, exclusive of appellant's testimony in denial, appellee's own testimony shows conclusively that the relations of the parties were nothing more or less than voluntary acts of fornication between parties of mature age and experience. In jury trials which are guaranteed by constitutional and statutory provisions, the jury are the exclusive judges of the credibility of the witnesses and the weight to be given to the testimony, and to authorize the court to take the case away from the jury "the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." Lee v. Railway, 89 Tex. 588, 36 S. W. 63; Joske v. Irvine, 91 Tex. 575, 44 S. W. 1059. Tested by this rule, we think the peremptory instruction was properly refused.

Appellee testified very explicitly to the fact of appellant's promises of marriage and of her acceptance thereof, and the record contains numerous letters written by appellant,

couched in the most endearing terms. As early as November 2, 1906, appellant wrote: "My Dear Clara: * * * Oh, how I wish I were with you tonight, but it is not only tonight I am wishing it nearly all the time. * * * I received your photos. So with these lines I will close, with love to all, but reserve most for yourself." December 30, 1906, he wrote: "My Dear Clara: * * * Well, how are you, oh how I would love to be with you tonight. * * * I think I could have enjoyed myself with you today there was hardly a minute that you was not on my mind. * * * Did you get the rings yet? How are they? * * * I know they will look nice, but not as nice and sweet as the wearer. I do wish I could be with you more. * * * Give my love to sister and the baby [referring to a sister of appellee, and her child] but reserve the most for yourself." January 6, 1907, he wrote: "Dear Darling: I received your sweet letter Wednesday and was awful glad to hear from you. It is just one week ago tonight since I wrote you, but it seems like a month. I will now try to write you again tonight. I worked all day, worked around the place here this morning, and worked a bunch of cattle this evening, and turned them in a field so you see I am kept busy all the time but my mind is kept the busiest for I have to keep it employed with my business, but when I have it engaged on my business it drops right off on you and there is no time through the day nor night unless when I am asleep that you are not in my mind. * * * Tell sister when I come down she has got to tell me all about what the trouble is between her and Daddy. * * * Dear Darling: Just as I go to mail this letter this Tuesday, the 8th, I rec. your little letter of yesterday with the sweet bunch of violets, but the sweetness was nothing to compare with the sweetness of the sender. I love you dearly and wish I were with you now." January 14, 1907, he writes: "* * * I thought I would drop you a few lines, but I don't guess you will care to get it or you would have written before this, you said you were going to write last Sunday, but of course you forgot all about it. Unless it rains again we will get shaped up so you can all come up Thursday morning on the Rock Island. * * * I will call you up on Wednesday evening about 7 or 8 or 9 o'clock and see for certain if you are coming, so we can meet you. * * * I don't want you to come until it is so that we can have time to be with you, and take you around. * * * I am well and love you but I don't think you care anything about being bothered with me or you would have written sooner." February 8, 1907, he wrote: "My Dear Darling: Your nice sweet letter rec. Wednesday, was glad to hear from you and that you were all well. * * * I have been very busy as we were short on hands. * * * I think I can get everything shaped up by the last of next week to come down

there. I am awful anxious to see you and be with you. * * * I love you dearly and would like to be with you often, but you see I can't let love affairs interfere with my business, but whenever my business will permit me I will be with you."

These letters—and there are others of like character—it seems to us are corroborative of appellee's story of the engagement. Therein we find him referring to appellee in terms strongly indicative of a man's purpose to win the love of a good woman, and inconsistent with a belief on his part that she was a wanton. He in terms refers to appellee's sister as his own, sends affectionate messages to her mother, manifests fear of a loss of her regard, and otherwise demeaned himself, according to appellee's testimony, consistently with the attitude of a promised husband. It is true that both parties confessed to subsequent illicit intercourse, but these letters all occurred prior thereto.

Appellee testified that the first carnal intercourse took place, after several previous solicitations on appellant's part, in the month of August, 1907. Appellant testified that it was some time in September or October of 1907. She testified that when he first proposed it she told him that "we would wait until we were married. I did not on that occasion have carnal intercourse with him. He insisted on it and said there would be no harm as we were to be married anyway, and that he did not care to wait; that he thought that he had proven to me that he was sincere." She says that this first proposition was some time in March of 1907, and that "he repeated that proposition to me every time that he saw me." He testifies that the consideration for the final accomplishment of the purpose was the loan of certain jewels and of $3,000 advanced to her. She says that the jewels were given to her, including an engagement ring, and the $3,000 advanced for her support until appellant could so arrange his business as to fulfill their marriage engagement. She further testifies that "the reason that I yielded to his request to have carnal intercourse was because I had learned to love him, and I could not refuse him any longer, I don't know why; he promised so faithfully that he would marry me, and I thought he was sincere. I certainly would not have engaged in that act with him if I had not thought he was sincere. * * * All the time—every time I saw him—he made those promises to me that he was going to marry me. He would say that his business was in such a shape that he had not been able to marry me, and that he was shaping everything up so that he would not have to work any more; said that he did not want to have to work any more after we were married. Every time I would tell him I did not see any reason why we should not be married; that we were both old enough. I believed in him implicitly." But we think we have referred to and copied sufficient

evidence to show that the case was one for the jury. The record shows that appellee was a resident of Tarrant county and that the appellant was a resident of Clay county, where the trial occurred. Each of the parties and their counter statements and explanations were all before the jury. The case was later reviewed by the trial judge, and we now cannot say that the verdict and judgment is wrong or unsupported by the evidence. If by any possibility appellee is an adventuress, as designated in appellant's brief, though not so by his pleading or evidence, we can only say that he who knowingly and voluntarily consorts with the abandoned and with them participates in wrongdoing ought not to be surprised that the person in pari delicto at last deals with him treacherously. Under such circumstances, in the forum of conscience the parties must generally be left in the situation in which they are found. At least the courts of the land can only relieve the complaining party from the natural fruits of his own wrongs in the way pointed out by the law. They are not required to strain the quality of mercy or devise new ways of escape.

[18] Finally it is earnestly insisted in several forms that the verdict and judgment are excessive. But in this, too, exclusive of the item of $10,000 special damages hereinbefore adverted to, we feel that we must decide against appellant's contention. True the verdict for actual damages, $35,000, seems very large, but terms expressing size and quantity are but relative. The foothill on its lower slope may be small when compared with the mountain, but the mountain itself is insignificant when compared with the earth upon whose bosom it rests. The mite of the widow was of magnitude in the estimation of the Redeemer, though the greatest individual fortunes in the early history of our country amounts to little when compared with the fortunes of a J. D. Rockefeller or a J. P. Morgan. So here we cannot say, under all of the circumstances, that the size of the jury's verdict is so large as to indicate passion and prejudice or other improper motive authorizing or requiring us to set aside the verdict.

Appellant testified that at the time of the trial he was 62 years old. The record fails to disclose that he has a living father, mother, sister, brother, or child; he owns between 13,000 and 14,000 acres of land that he says in one place "I expect it is worth $10 per acre"; in another that "I don't know that the land is worth $15 per acre; it is not for sale; I don't know what it could be sold for." He further says, "I have, I expect, 1,000 head of cattle all told." Of these, between 200 and 300 head were steers worth $30 to $35 per head, the remainder "something like $15 per head." Besides this he owned "about $10,000 in bank stock" and "a place back in Pennsylvania about 90 acres probably." He says, "I don't know what it is worth. It is not so

very valuable; it is an old homestead place, I don't know what it would sell for." What further property, if any, appellant owns is not disclosed by the record, but the evidence authorizes the inference that he is worth not less than $160,000, and probably as much as $250,000.

Appellee was a widow some 32 or 33 years old having divorced a former husband on the ground, as she testified, of his infidelity. She was without means, so far as disclosed by the record, and a marriage, such as her evidence indicates that she had a right to expect, with a man of appellant's wealth, and having presumably a reasonable expectation of inheriting that wealth, would, in the nature of things, be of an advantage and value to appellee not to be measured by a few dollars and cents. To the loss of an advantageous marriage must be added the hardship and distress of mind resulting from the situation in which she was left.

[19] While it is otherwise in appellant's brief, neither by pleading nor by his evidence did appellant attempt to show that appellee prior to his association with her was without the crowning glory of all womanhood, and by a well-settled rule of law, therefore, we are required to indulge the presumption that she was of good moral character. On the trial on cross-examination she denied that she went "into society at all," or that in Ft. Worth she had "associated with any man" other than appellant, and as stated no attempt by evidence was made to dispute this. Also as stated appellee testified that appellant had won her love, confidence, and trust. These were shattered, and appellee was left loveless and penniless, with disappointed hopes, with tarnished character, and with a nameless girl child to care for. Who better than a jury can measure, so far as they can be measured in dollars and cents, the magnitude of the misfortune, the humiliation, the depth of the despair naturally arising from such a situation and fate? We confess that we are not able to better do so even if permitted by law.

But the rule of law is thus stated by our Supreme Court in a quotation with approval from Field on Damages: "Damages in this character of case rest largely in the discretion of the jury, and this discretion is seldom interfered with and should be in no case except where it is manifest that the jury were influenced by prejudice, passion, or corruption." Daggett v. Wallace, 75 Tex. 356, 13 S. W. 50, 16 Am. St. Rep. 908. The author of Cyc. states the rule in the following language: "The question of the justice or adequacy of a verdict for plaintiff in an action for breach of marriage promise rests almost wholly in the judgment of the jury and the discretion of the trial judge. Accordingly, however large the damages may be, and although higher than the court would have awarded, the verdict will not

be disturbed unless the damages appear to be flagrantly excessive or disproportioned to the injury received by plaintiff, even though there be newly discovered yet cumulative evidence in defendant's favor, or unless it appears that the jury were influenced-by passion and prejudice, and that the trial judge failed to exercise a sound discretion in reviewing that question." See 5 Cyc. 1021, § 3, citing numerous cases in the notes. In Broyhill v. Norton, 175 Mo. 190, 74 S. W. 1024, the Supreme Court of Missouri held that a judgment for $12,500 against a mail clerk of small means would not be excessive. Appellee cites us to the case of Campbell v. Arbuckle, 123 N. Y. 662, 26 N. E. 750, by the Court of Appeals of New York, affirming in an unwritten opinion a judgment, it is said, in a similar case for $45,000, of which it is stated there is full report in 51 Hun, 641, 4 N. Y. Supp. 29, but the case is not available to us, and we cannot give the particulars. Other instances of large verdicts in cases of similar nature might perhaps be referred to with profit, but we will not longer delay our determination by an effort to find them. Suffice it to say that, after reviewing all of the circumstances, we feel unable to hold that the verdict was other than a fair expression on the part of the jury, based upon the evidence before them, particularly in view of the undeniable fact that their action has been fully approved by the trial court.

In conclusion we will add that, being impelled by the size of the verdict and the importance of the case to the parties, we have given it the most careful consideration, disposing of all assignments of error at unnecessary length perhaps, but have found no error in the proceedings that in our opinion will justify a reversal of the judgment save the one in the court's charge authorizing, as we have held, the assessment of double damages.

For this it is ordered that the judgment be reversed and the cause remanded for a new trial unless appellee shall, within 10 days from this date, file a remittitur of said sum of $10,000 awarded by the jury as special damages, in which event the judgment will be reformed and affirmed for the remaining sum of $35,000 actual damages, at appellee's cost.