SOUTHERN KANSAS RY. CO. et al. v.
SHINN. (No. 2554.)

(Commission of Appeals of Texas, Section A.
Dec. 21, 1918.)

1. MASTER AND SERVANT ☞255(30)—RAIL-
ROADS—OPERATION OF SIGNAL BOARD—DUTY
TO LOOK OUT.

Railroad employé operating signal board by
means of lever in projecting bay window of sta-
tion was not as a matter of law required to look
to see if track was clear before giving signal
that operator had no orders for engineer.

2. MASTER AND SERVANT ☞286(30)—INJURY
TO BRAKEMAN — DUTY OF SIGNAL BOARD
OPERATOR—JURY QUESTION.

In brakeman's action for injuries from sag-
ging telephone wires while on top of box car,
evidence *held* insufficient to justify submission
to jury of question whether operator of signal
board who had given engineer signal to proceed
had duty of looking to see if track was clear
before giving signal.

Error to Court of Civil Appeals, Seventh
Supreme Judicial District.

Action by J. E. Shinn against the Southern
Kansas Railway Company and others. Judg-
ment for plaintiff affirmed by Court of Civil
Appeals (153 S. W. 636), and defendants bring
error. Reversed, and judgment rendered for
defendants.

Terry, Cavin & Mills, of Galveston, Adkins
& Sewell and E. C. Gray, all of Higgins, and
H. E. Hoover, of Canadian, for plaintiffs in
error.

Gustavus & Jackson, of Amarillo, and W.
M. Whitmire, of Dallas, for defendant in er-
ror.

TAYLOR, J. The plaintiff, J. E. Shinn,
sued the defendant railway companies for
damages sustained from being raked off of a
box car by an overhanging telephone wire
while passing through the town of Higgins
on one of the defendants' freight trains. At
the time of his injury, he was employed by
the defendants in the capacity of brakeman,
and had gone upon the top of the car in the
discharge of his duties.

The telephone wires were the property of
the Canadian Long-Distance Telephone Com-
pany, strung across the right of way of the
defendants subsequent to the time of the
construction of the railway, and were in no
wise under the care, control, or management
of the defendants. A house mover by the
name of Bennifield, while engaged in moving
a barn about two hours before the approach
of the train on which the plaintiff was in-
jured, cut and loosened some of the telephone
wires about 200 feet south of the defendants'
right of way, thereby causing the sagging
condition referred to. The Court of Civil

Appeals found that the sagging condition of
the wires resulted from the independent act
of the house mover. The court found also
that the evidence was insufficient to charge
the defendants with actual notice of the sag-
ging condition of the wires, and that the
length of time intervening between the acci-
dent and the loosening of the wires by Benni-
field were insufficient to raise the question
of implied notice. 153 S. W. 636.

Under the state of the record before us,
all of the issues raised by the pleadings are
eliminated except the question of whether
the operator who signaled the train to pass
the station without stopping was guilty of
negligence in not looking out of the depot
window on the right of way to see whether
it was clear before giving the proceed sig-
nal. In discussing this issue the Court of
Civil Appeals said:

"When this particular train had reached the
yards of appellant, about one-half mile from
the station, going east, the engineer whistled for
signals, and it was the duty of the station
agent, or some one under him, to manipulate a
lever inside the station, situated in a bay win-
dow projecting over the platform, the operation
of which drops or raises a signal board, indicat-
ing whether to stop or proceed, as the occasion
demands, and in this instance the 'proceed' sig-
nal was given by the dropping of one of the
arms or board. and the engineer answered. with
appropriate whistles, to let the trainmen know
that a 'proceed' signal was given, and went on
through on the main track; and, when the
train was going through, the appellee was upon
the top of a box car, as it was his duty in going
by stations. The main track, on which this
train was running, was immediately next to the
station; and near the bay window, and inside of
same, the lever was situated, giving the opera-
tor of the lever, at the time of its manipulation
and before the train arrived at the station, a
sweep of vision east and west upon the main
track and up and down the right of way, so that
the man operating the lever could see the bunch
of wires about 300 feet away and east of the
station. In this record the station agent, and
the witness for defendant, testified as follows:
'The lever that operates the board is on that
desk that sits in the bay window. When an
incoming train whistles for the board, [if] the
man that is sitting there operating the board
does his duty, he would look and see if there
is a *clear right of way*, I suppose, but I do not
know as it is incumbent to do that. The engi-
neer does not whistle to know if there is a clear
track; he whistles to know if we have orders
for him. The literal meaning in the book is,
when we drop the board, *that is a clear track*.'
[The emphasis is ours.] While it may be the
agent hesitates in his testimony, and exhibits
an apparent contradiction in his statements, the
same may be resolved against the appellant, and
is sufficient to go to the jury on the question of
the duty of the operator of the lever to look in
each direction for 'a clear right of way.'"

[1] If it was incumbent on the operator
of the lever to look in each direction for a

clear right of way when the engineer whistles for signals, regardless of whether there was any special occurrence at that time to cause him to do so, his failure to discharge that duty was negligence, and the defendants would be chargeable with any injury resulting proximately therefrom. The character of the employment of the operator not being such as to warrant holding as a matter of law that it was his duty to look out before giving the signal, we are called upon to determine whether there is any evidence tending to prove that such duty devolved upon him. The testimony material to the determination of this question follows:

### Excerpts from Plaintiff's Testimony.

"I do not remember how long I had been on top of this car when we got into Higgins. As we approached every station we get orders; we are supposed to be governed by the board, and as the engineer whistles for signals the agent handles the board. I forget the correct name of this board, but it is a board that has a couple of arms projecting up above the track, one on the right side and one on the left in order to handle the trains coming in there. and when the engineer whistles for signals, the agent handles this board by a lever from the inside, and we got a proceed signal, and we went right through. By proceed signal, the best I can remember, I believe the right arm went down in order to show a clear right of way. We were at the end of the yard when the engineer whistled for the signal, and that is about one-half mile, I believe. When the board dropped for him, the engineer answered by whistles to let the trainmen know that he got a proceed signal and he went on. * * * The depot there has kind of a bay window. That picture fully represents it; yes, sir; and there is a bay window or projecting window out this way (indicating) which is to enable the man in there can watch the trains from both ways."

C. S. Cravens testified on direct examination as follows:

"I reside at Higgins, and resided there in October of 1910, and acted in the capacity of first trick [track] operator for the railroad. I should judge that the accident to the plaintiff occurred about 11 o'clock. I remember the time and was there that day, and was handling the board at that time. I gave a signal for the train to pass there, because the engineer asked for it by giving four blasts of the whistle, and I answered by giving him the board, to go on through. I meant by that that I had no orders for him. At that time I did not know, had no advice and had no reason to know, that there were any wires or overhead obstruction there. I knew nothing about the wires; no, sir; and had no reason to believe or think they were in a dangerous condition. I did not know that this house was being moved, and did not know that the telephone wires were being tampered with or had been tampered with."

On cross-examination he testified:

"When he whistled I gave him the clear board, and just gave him the board because I had no orders for him.

"Q. You did not look for any obstructions? A. That was not my business.

"Q. You were busy when he whistled, and you just gave him the board? A. I gave him the board. .I don't know how busy I was.

"Q. You cannot say now that you looked to see whether or not he had a clear right of way, you based it on the instructions? A. The instructions you had were if he whistled, and you had no orders you just gave him the board."

The following excerpts are taken from the testimony of the station agent, W. H. Brewer.

"The operator had charge of giving them the board. The operator was Cravens, and he is here as a witness. * * * I think there were three men in the station at that time, possibly four. I did not give the signal board when the whistle blew; it was another man that gave it. I did not know what the condition was as to the right of way. I did not look to see this. It is something like 300 feet down there to where these wires are. The window that we set in in receiving and answering signals from approaching trains is a bay window projecting out so we can look down the track either way; and it had glass windows in so that we can look down the track. The lever that operates this board is on that desk that sits in the bay window. When an incoming train whistles for the board, the man that is sitting there operating the board does his duty. He would look and see if there is a clear right of way, I suppose, but I don't know as it is incumbent to do that. The engineer does not whistle to know if there is a clear track; he whistles to know if we have orders for him. The literal meaning in the book is that when we drop the board that it is a clear track. You see we haven't time to run out every time a train whistles. We are busy. and when a man whistles for the board we haven't time to run and look up and down the track; we have to tend to our duties, which keep us at our desk all of the time. We give him the board when he whistles for it if we have no orders for him. He is supposed to see the main track himself, and if he sees any obstruction on the track and don't stop he is responsible for it. He is out on the main line and can see more territory than we can. I do not know as a man on a train going 30 or 40 miles an hour would be charged with wires down at the depot when he whistles for the board; he could not see them. I don't think he could see them until he got pretty close. He could see the bulk of the wires I am pretty sure. How could you expect us to see the obstruction unless we could see it from the office. There was no obstruction between our office and those wires down there that I know of. There is no track where cars can stand that would obstruct our view of those wires from the office. * * * There is nothing in the rules about our going out and looking up and down the track when we give a signal for a train to proceed nor to look up in the sky to see whether or not there is anything hanging from the sky. The right of way is located on the ground, and the railroad owns the right of way."

Was any part of the foregoing testimony in the light of the whole sufficient to go to the jury on the question of whether the operator was charged with the duty of inspecting the

right of way from his seat near the window before giving the proceed signal in response to the engineer's whistle? The following excerpt from the station agent's testimony is held by the Court of Civil Appeals to be sufficient:

"The lever that operates the board is on the desk that sits in the bay window. When an incoming train whistles for the board, [if] the man that is sitting there operating the board does his duty, he would look to see if there is a clear right of way, I suppose, but I do not know as it is incumbent to do that. The engineer does not whistle to know if there is a clear track; he whistles to know if we have orders for him. The literal meaning in the book is, when we drop the board, that is a clear track."

It is plain from the station agent's statement quoted that it was not the duty of the operator to look out for the track. "The engineer does not whistle to know if there is a clear track; he whistles to know if we have orders for him." There is no testimony in the record contradicting this statement. In addition, the operator testified that he gave the engineer the "clear board" when he whistled "because I have no orders for him." The station agent testified, "The literal meaning in the book is, when we drop the board, that it is a clear track." There is no other conclusion to be drawn from the references of the station agent and the operator to a "clear board" and a "clear track" than that both expressions meant there were no orders for the engineer.

[2] That portion of the testimony quoted by the Court of Civil Appeals bearing directly on the operator's duty is as follows:

"When an incoming train whistles for the board, [if] the man that is sitting there operating the board does his duty, he would look and see if there is a clear right of way, I suppose, but I do not know as it is incumbent to do that."

The only fact specifically stated by the witness having any relation to the operator's duty to look out is, "I do not know as it is incumbent to do that." It is true that the station agent says "he would look and see if there is a clear right of way I suppose" if the operator does his duty, but this supposition of the witness, even in the absence of his unequivocal statement that he did not know whether it was incumbent on the operator to look, does not carry with it that degree of probative force necessary to form the basis of a legal inference. At most, the supposition, alone, would do no more than raise a mere surmise as to what the duty of the operator was on such occasions. This testimony, even if we eliminate from it the positive statement referred to, and disregard the apparent contradiction mentioned by the Court of Civil Appeals, falls short in legal con-

templation of "any evidence" to support the conclusion that it was the duty of the operator before answering the engineer's signal to look out on the right of way. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

We are of opinion that the Court of Civil Appeals erred in holding the testimony of the station agent sufficient to go to the jury on the question of the operator's duty.

As the facts seem to have been fully developed on the trial, we recommend that the cause be reversed, and judgment rendered for the defendants.

PHILLIPS, C. J. The judgment recommended by the Commission of Appeals in the above case is adopted and will be entered as the judgment of the Supreme Court.

