## CLEMENT et al. v. EMMONS.

### No. 2507.

Court of Civil Appeals of Texas.
Tenth District.

April 8, 1943.

Rehearing Denied April 29, 1943.

Geo. W. Barcus, of Austin, and F. J. Bauerle, of Waco, for appellants.

Geppert, Geppert & Victery, of Teague, and H. S. Beard, of Waco, for appellee.

TIREY, Justice.

Richard Emmons brought this suit against J. M. Clement and Lynn Elkins to recover damages which he claimed to have suffered by reason of having been falsely imprisoned at the instance of J. M. Clement. On the verdict of the jury the court granted plaintiff's motion for judgment and awarded to him a recovery of $650, jointly and severally against the defendants Clement and Elkins. Defendant Clement seasonably filed motion for judgment non obstante veredicto, which motion was overruled, and this action of the court is assailed as error. (Elkins perfected his appeal and adopted the points raised by Clement.)

The point raised requires a comprehensive statement. Plaintiff alleged substantially that he was falsely and unlawfully arrested and imprisoned by Lynn Elkins (no warrant having been issued) and that Elkins, in making such arrest, was acting in the scope of his employment as agent of Clement and at Clement's request and under his direction. The jury found substantially (1) that Elkins was acting as Clement's agent and under his instructions when he arrested plaintiff and took him to jail and was not acting solely as deputy constable, nor solely upon the advice of Bauerle, Assistant District Attorney; (2) that Elkins, prior to the time he arrested plaintiff, fully informed Bauerle of the information "he had relative to whether Richard Emmons was by himself or in connection with G. R. Smith stealing personal property from Clement Grain Company"; (3) that Elkins acted upon the advice of Bauerle when he arrested plaintiff and filed the complaint against him; and (4) that Elkins did not sign a complaint against plaintiff at the time plaintiff was taken before Bauerle, nor did Bauerle file a complaint with the justice of the peace, nor was there a warrant of arrest issued for plaintiff.

There was testimony to the effect that defendant Clement was conducting a wholesale and retail grain business under the name of Clement Grain Company. In April, 1936, he had information which caused him to believe that parties unknown to him were stealing grain from his place of business. After consulting with the sheriff of McLennan County he employed defendant Elkins, a Deputy Constable, to investigate the matter and agreed to pay him a stipulated sum per day for services rendered. Elkins watched the store for five or six nights and reported to Bauerle that G. R. Smith, the night clerk, was implicated in the stealing of the grain, and at the suggestion of Bauerle, Elkins brought Smith to the District Attorney's office, where Smith made a confession, stating in substance that he and plaintiff and Estes Goulding had been stealing grain from the Clement Grain Company for several months, and that the total amount stolen was worth several thousand dollars. Bauerle then advised Elkins to arrest plaintiff and Goulding and Bauerle went with Elkins to the Clement Grain Company for the purpose of arresting them. Elkins arrested plaintiff and took him to the District Attorney's office. Shortly after Elkins arrested Emmons, Goulding was arrested by two city policemen and brought to the District Attorney's office. After plaintiff and Goulding were questioned by Bauerle and Elkins in the presence of Smith and Clement, Bauerle prepared a complaint against Emmons and Goulding which charged them with the offense of theft over $50, which complaint was signed by Elkins on the advice of Bauerle, and Elkins, acting on the advice of Bauerle, placed both Em-

mons and Goulding in jail, without a warrant having been issued for their arrest. They remained in jail about forty hours and were then released on bond. The Grand Jury failed to indict plaintiff, Goulding, or Smith.

Plaintiff testified, in substance, that he was asleep immediately prior to his arrest:

"Q. What is the first thing you heard anybody say that woke you up? A. Well, this Elkins opened the door, I guess. He jerked me out on the fender and woke me up and I got up—he jerked me up down on the fender and I didn't know what it was. I thought somebody was robbing me and I pushed him back and he said 'I am the law. You are under arrest,' and he started searching me, and so after he told me he was the law I didn't do anything about it and Mr. Clement said, "All right, we have got the damn thief now,' and he said, 'You are under arrest,' and so I said 'What for?' and he said, 'We will tell you when we get over to the courthouse.'

"Q. Well, did anybody say anything about taking you to jail? A. Over at Mr. Clement's?

"Q. When Elkins, you say, pulled you out of the truck. A. Mr. Clement told him to carry me to jail".

that while in the office of the District Attorney, Mr. Clement was present and that Elkins related to him what Smith had said about stealing grain from the Clement Grain Company.

"A. Well, he said that Mr. Smith had told him that I told him I would give him a suit of clothes; then he said afterwards that I told him I would kill him, I would put a gun on him ever time I come over there; I think he said ninety times I had robbed him, I had put a gun on him and made him give me ninety loads of feed on my truck".

that he refused to make a statement that he had stolen anything from the Clement Grain Company; and that thereafter he was taken to jail; that Elkins did not take him before a justice of the peace, county judge, or any magistrate before taking him to jail, and he denied all the statements that Smith had made about the theft.

Plaintiff offered in evidence the cross-examination of the defendant Elkins on a former trial, which testimony was to the effect that he arrested plaintiff without complaint having been filed and warrant having been issued, and that he placed him in jail on suspicion; "Q. The only information that you ever had that Emmons hadn't paid for every pound of grain that he got, you got from this man Smith, didn't you? A. No, sir, I got it from Mr. Clement"; that he didn't see Clement at the jail, but he did see him at the District Attorney's office; "* * * I called him myself." Elkins testified by deposition as to his employment with the Clement Grain Company, in part, as follows: "Mr. J. M. Clement told me that he believed someone was stealing grain from Clement Grain Company; that he had no idea who it was but would like for me to try and find out; I told him I would see what I could do; our conversations constituted the only agreement between us * * * I was not at the time personally acquainted with Richard Emmons; and first met Emmons the night he was taken into custody"; that he was not acquainted with G. R. Smith and first met Smith on the same night that Emmons was arrested; "* * * I was present and G. R. Smith told Assistant County Attorney R. J. Bauerle that he (Smith), Richard Emmons and Estes Goulding were engaged in a combination to steal grain from the Clement Grain Company; I don't recall the exact words of the conversation but Smith said some months before this he wanted to quit stealing grain from this company, and Emmons threatened to kill him if he did; so Smith continued with Emmons and Goulding in stealing this grain; and Smith estimated they had gotten away with four or five thousand dollars worth in the last seven or eight months; * * * after G. R. Smith had made the statement to Assistant County Attorney R. J. Bauerle about stealing grain from Clement Grain Company, then Mr. Bauerle stated that in his opinion, from the statements made by G. R. Smith, that Richard Emmons should be arrested for the theft of this grain. * * * After the statements by G. R. Smith and the conversation with Mr. Bauerle, I went with Mr. Bauerle to Clement Grain Company and we waited a while until Richard Emmons drove up; when Emmons came up the steps to the building Mr. Bauerle told me to take Emmons in custody and we then carried him to the County Attorney's office, where Mr. Bauerle then advised me to, and I thereupon did file a complaint with the County Attorney, at Bauerle's request, charging Emmons with the

theft of the grain from Clement Grain Company. * * * I arrested Richard Emmons when Assistant County Attorney Bauerle was with me, and at his direction; Mr. Bauerle accompanied Emmons and me to the courthouse when the arrest was made; I was acting alone upon the advice given me by Mr. Bauerle, Assistant County Attorney; the only persons present when this was done were Mr. Bauerle, Richard Emmons and myself; I was in consultation with Mr. Bauerle and no one else. * * * J. M. Clement nor anyone connected with Clement Grain Company advised me to arrest Richard Emmons; his arrest was made on direction of Assistant County Attorney Bauerle. * * * Yes, the complaint against Richard Emmons was made prior to the time he was placed in jail; it was done on advice of Assistant County Attorney Bauerle; and the complaint was left with Mr. Bauerle after I signed same." He further testified to the effect that prior to the time G. R. Smith had his conversation with Bauerle that he (Elkins) did not know or suspect that Emmons was in anyway implicated in the stealing and that he did not know Emmons before he arrested him. "J. M. Clement may have been at the store, but he was not with me, and I was not with him when Richard Emmons arrived at the store. * * * J. M. Clement was at his store the night I arrested Emmons because I had telephoned him that I was taking G. R. Smith, his night man, away from the store. The Clement Grain Company kept open at that time all night, and G. R. Smith was the man who was in charge, and since I was taking G. R. Smith away, I notified J. M. Clement, and he came down to keep the store open. Clement had nothing whatever to do, however—. * * * G. R. Smith made a very extended statement and signed same, and it was left with the Assistant County Attorney Bauerle. I do not remember all that was contained in said confession. As I recall, the substance of his confession was that he and Richard Emmons and Estes Goulding had entered into an agreement by which G. R. Smith, as night salesman for Clement Grain Company, would make out bills showing the amount of feed that Estes Goulding and Richard Emmons were receiving and paying for, and would then put on their loads a considerable amount of grain or feed, for which no account was made, and which was not placed on the sales ticket, and the money paid for this additional grain or feed was then divided between the three of said parties. Smith stated that the three of them had obtained several thousand dollars worth of feed from Clement Grain Company by that method, for which Clement Grain Company had not been paid."

F. J. Bauerle (attorney of record for Elkins) testified substantially to the effect that he had been Assistant District Attorney for approximately five and one-half or six years; that generally he handled the Grand Jury for the office and assisted in the trial of district court cases and did practically all of the investigation especially at night, because he was the only single man in the office; that about 10 o'clock at night Elkins came to his house to discuss this matter with him and wanted to know the best way to handle it; that Elkins believed the Clement Grain Company had been losing grain over a period of several months and that the night watchman was working with some other fellows; that that night he thought probably some of the fellows would be over there who had been getting some of the grain; that he suggested that they get Smith, the night watchman, over to the office and question him before the other fellows came in; acting upon that suggestion he and Elkins got Smith to the District Attorney's office about 11 o'clock that night and Smith made a confession; with reference to the contents of the confession Bauerle said: "He said that he was on duty alone over there at Clement Grain Company at night and that Emmons and this fellow Estes Goulding come over there at night and he would load them up. Well, he would load them with so many sacks of feedstuff and grain, but only make out the invoice for a certain amount, less than the actual amount that he had placed on their truck; that in turn they were to split with him, but that all he ever got out of it was a suit of clothes and that they had paid off a note on a cow of his and he said that this had been going on for about seven months, and as well as he could tell, they had probably gotten away with about four or five thousand dollars worth of grain, and he was mad about it because he didn't get his cut."

"Q. After you had the conversation and that confession from Mr. Smith, then what, if anything, did you advise Mr. Elkins to do and what did you do? A. Well, then we decided to go over there and wait for these fellows that were due in

614

that night and we had just gotten over there when Richard Emmons and a younger fellow whose name I don't recall drove up and as I recall Richard Emmons was asleep in the cab of the truck and Lynn opened the door and jerked him out. Well, I say 'jerked' he kind of tapped him on the shoulder and woke him up and he come out and we brought him back over here to the district attorney's office and I questioned him and he said—well, he just wouldn't talk about it; that is all, he didn't deny it, wouldn't affirm it; he just wouldn't talk; that is all. * * *

"Q. Did you go with Mr. Elkins when he went over there to arrest—A. Yes, sir, I believe we went over in my car.

"Q. Who brought Emmons back? How did Emmons get back? A. Came back the same way we went over, and I believe it was in my black Chevrolet, * * *.

"Q. Did Mr. Clement come over with you when you and Elkins brought Emmons back? A. He and Madison were in a one-seated car. They weren't with us. They were over there. He was at the plant at the time Lynn took him out of the cab; we were leaving there before they knew anything about it. * * *

"Q. Did J. M. Clement tell either you or Mr. Elkins to arrest Emmons? A. No, no, I was the one responsible for it because I had that confession and that was the starting point and they had already checked tickets before from what I had learned, and there was a discrepancy. Lynn had checked up on it and * * *."

Bauerle testified on cross-examination substantially to the effect that the complaint was prepared by him in the office and signed by Elkins and that it was filed, but so far as he knew no warrant was issued.

■ The first question that presents itself is: Did Elkins make an illegal arrest at the time he took custody of plaintiff and thereby commit an actionable tort? We think so. Articles 212, 213 and 215 of the Code of Criminal Procedure set forth the circumstances under which a peace officer may arrest an offender without a warrant. The mere reading of Articles 212 and 213 will disclose that it is unnecessary to discuss them. Art. 215 provides: "Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a

warrant, such peace officer may, without warrant, pursue and arrest the accused." The facts of this case are without dispute that Emmons was in his truck asleep and that the truck was standing still when Elkins arrested him and carried him to the District Attorney's office, and at that time no complaint had been filed against Emmons, nor had any warrant been issued for his arrest, nor was Emmons engaged in the commission of any offense at the time he was arrested, nor is it contended that Emmons was about to escape. It is clear to us that Emmons' arrest does not come within any of the exceptions provided in Articles 212, 213 and 215, aforesaid, nor do appellants so contend. See Vinson v. State, 138 Tex.Cr.R. 557, 137 S.W.2d 1048.

■ The next proposition that presents itself is: Since the record is without dispute that Elkins was employed by Clement, and since the jury found that at the time Elkins took Emmons in charge and carried him to jail that Elkins was acting as an agent of Clement, does the doctrine of respondeat superior apply, notwithstanding the fact that the jury also found that Elkins acted upon the advice of the Assistant District Attorney when he arrested Emmons and filed the criminal complaint against him? We think so under the record here made. See Burton v. Roberson, 139 Tex. 562, 164 S.W.2d 524, points 2-3.

Emmons testified, in part:

"Q. Well, did anybody say anything about taking you to jail? A. Over at Mr. Clement's?

"Q. When Elkins, you say, pulled you out of the truck? A. Mr. Clement told him to carry me to jail."

He further testified to the effect that Clement was present at the District Attorney's office when the District Attorney and Elkins interrogated him about the statements that Smith had made to them. There is nothing in the record to indicate that Clement said anything at the conference in the District Attorney's office, nor that he made any protest when Elkins took Emmons to jail. Clement was ill, his deposition was not taken, and he did not testify on this trial, nor did his attorney offer in evidence the testimony given by him on a former trial although plaintiff offered his counsel the privilege of so doing. Plaintiff placed in evidence the testimony of Elkins on a former trial, wherein he testified substantially to the effect that he ar-

 

rested plaintiff on suspicion, that no complaint was filed, that he did not have a warrant for his arrest, and that the plaintiff was not stealing anything at the time he arrested him. "Q. The only information that you ever had that Emmons hadn't paid for every pound of grain that he got, you got from this man Smith, didn't you? A. No, sir, I got it from Mr. Clement." There is testimony in the record to the effect that Elkins was a Deputy Constable and had been a peace officer for many years. But regardless of what his status was, since it is without dispute that he was in the employ of Clement, we cannot say, as a matter of law, from all the facts and circumstances attending the arrest of Emmons, that Elkins was acting in an official capacity at the time he made such arrest. Texas & N. O. Ry. Co. v. Parsons, 102 Tex. 157, 113 S.W. 914, 132 Am.St.Rep. 857. In the case of Rucker v. Barker, 108 Tex. 280, 192 S.W. 528, the officer making the arrest was a deputy constable and was also an employee of Rucker, the proprietor of a medicine show. The Supreme Court, in disposing of the case on a jury verdict favorable to Dyer, a minor and patron of the show and the party arrested, said: "It was not necessary for Rucker to have authorized the specific acts which Roberts committed in his treatment of Dyer in order to be liable in actual damages for Roberts' conduct. If Roberts at the time was acting within the general scope of his duties as Rucker's employe, Rucker was responsible for his action, though it was in excess of Rucker's actual instructions. It was a question of fact as to whether Roberts was acting upon his own volition as a peace officer, or as Rucker's employe." In the case of Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1064, the arresting officer was called by Joske, but such officer was not in the employment of Joske, and the court placed emphasis on the fact that "there is no direct testimony that Joske 'requested or directed' the arrest, and we are of the opinion that such fact cannot be reasonably inferred from the circumstances. * * * We are of opinion that nothing is shown to have occurred there that would warrant the inference that Joske 'requested or directed' Shely to make the arrest. The conversation * * * shows the contrary, and that Shely made the arrest on his own responsibility, against Joske's request; * * *." Our view is that under the rule announced by our Supreme Court in Rucker v. Barker, supra, and Jos-

ke v. Irvine, supra, the trial court's judgment must be affirmed.

We have considered each of the other assignments of error raised, and we are of the opinion that they do not present reversible error and each is hereby overruled.

The judgment of the trial court is affirmed.