ALEXANDER JOSKE v. JAMES IRVINE.

No. 639.—Decided March 21, 1898.

1. **Unlawful Arrest—City Ordinance.**

A charge that the arrest of plaintiff without warrant, by a city police officer, as a suspicious character, was unlawful, was proper, irrespective of the validity of the ordinance under which the right to arrest was claimed, where there was no evidence of the existence of such ordinance. (Pp. 576, 577.)

2. **Same—Evidence.**

See evidence by such officer as to authority under which he acted, held not to show the existence of such ordinance. (Pp. 576, 577.)

**3.  Unlawful Arrest—Request or Direction—Evidence.**

See opinion for evidence held insufficient to show that such arrest was by direction of defendant.  (Pp. 577 to 584.)

**4.  Directing Verdict—Absence of Evidence.**

It is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established—such testimony, in legal contemplation, falling short of being "any evidence;" and it is the duty of the court to determine whether the testimony has more than that degree of probative force.  Pp. 581 to 583.)

ERROR to the Court of Civil Appeals for the Fourth District, in an appeal from Bexar County.

Irvine sued Joske for unlawful imprisonment and recovered a judgment, affirmed on appeal by defendant, who then obtained writ of error.

*Franklin & Cobbs*, for plaintiff in error.—The court erred in charging the jury that the arrest of plaintiff by Joe Shely was illegal for this: (1) Said arrest is shown by the testimony to have been legal.  (2) Under the facts proven, the question of the legality of the arrest was one of fact, and should have been submitted to the jury.  Charter, City of San Antonio, secs. 55, 103, 219, 253.

The court erred in charging the jury that if defendant directed or authorized the arrest of plaintiff that he was liable in damages, for this: (1) There was no evidence before the jury showing or tending to show that defendant directed the arrest.  (2) The charge requires the jury to find for plaintiff if defendant directed the arrest, without any qualifications, when the pleading alleges that the arrest was without any probable or reasonable cause, and without the consent of plaintiff, and under said charge the jury could not have found for defendant, although they should believe that the arrest was made upon probable or reasonable cause or by the consent of plaintiff.  (3) The testimony of plaintiff in the case is to the effect that defendant stated that he would make a complaint against plaintiff, and there is no evidence that defendant directed Shely to make any arrest until after such complaint was made, nor is there any evidence that defendant knew such arrest would be made by said Shely, and the proof shows that defendant made no complaint. (4) Because the evidence shows that when plaintiff was arrested by said Shely, it was in the exercise of discretion confided in said Shely by the ordinance of the City of San Antonio, and although said Shely may have been mistaken in this construction of said ordinance, yet defendant herein could not be held liable for such mistake, nor could it be assumed, as is done in the charge complained of, that even if defendant directed the arrest, that he directed such arrest to be made illegally.

At common law, watchmen and beadles had authority to arrest and detain any person for examination walking the streets at night time, when there was a reasonable ground to suspect felony, although there was no proof of a felony having been committed.  Newell, Malicious Prosecution, 78; Lawrence v. Hedger, 3 Taunt., 14; Miles v. Weston,

60 Ill., 361; Hawkins, Pleas of the Crown, ch. 13, sec. 6, ch. 12, sec. 20; Tooley's case, 2 Lord Raymond, 1296; Bouvier's Law Dic. 230; Stokes v. State, 9 So. Rep., 400.

*C. K. Breneman*, for defendant in error.—The court correctly charged that the arrest of Irvine by the officer Joe Shely was unlawful. The citizens of this country hold their liberty and the freedom of their persons from unlawful seizure, by no such precarious tenure. Newburn v. Durham, 10 Texas Civ. App., 659. The courts of this State are not eft in doubt as to who is a "suspicious character," within the meaning of our Criminal Statutes. The attention of this court is respectfully invited to title 5, chap. I of the Code of Criminal Procedure and particularly to art. 249 thereof. "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation." Bill of Rights, sec. 9; Lacy v. State, 7 Texas Crim. App., 411.

The evidence shows clearly, and established the fact to the satisfaction of the trial court and jury, that Joske directed and authorized Joe Shely to arrest Irvine and that the arrest was made without any reasonable or probable cause. "A party whose conduct aids or causes the commission of an illegal act, is liable for all the immediate consequences thereof." Wolf v. Perryman, 82 Texas, 120; Coffin v. Varila, 8 Texas Civ. App., 417; Newburn v. Durham, 10 Texas Civ. App., 658; Karner v. Stump, 34 S. W. Rep., 656; 3 Lawson's R. R. & P., sec. 1076.

DENMAN, ASSOCIATE JUSTICE.—Joe Shely, an officer of the city of San Antonio, arrested James Irvine without a warrant and confined him nearly twenty-four hours in the city prison. Irvine sued Alexander Joske to recover damages, claiming that such arrest was unlawful and directed by him. The arrest was not sought to be justified under any statute or charter provision, but under a city ordinance authorizing the arrest of suspicious characters without warrant. The trial court having instructed the jury that the arrest was unlawful, verdict and judgment were for plaintiff for two hundred and fifty dollars, which having been affirmed by the Court of Civil Appeals, Joske has brought the case to this court upon writ of error.

Said charge is assigned as error. The Court of Civil Appeals overruled the assignment on the ground that the city charter did not authorize the council to pass such an ordinance. We were inclined to hold otherwise at the time of granting the application for writ of error, but do not feel called upon to determine the question, for the reason that we do not consider that there is any evidence in the record of the existence of such an ordinance. The only testimony on the subject is that of Shely, as follows: "I made the affidavit against Irvine; the warrant issued on the ground of suspicious character. Under the city ordinance

we have a right to do so during investigation. * * * I have a right, as an officer acting in the discharge of his duty, to arrest anybody whom I think has committed an offense against the State or city. I thought this man had committed an offense from his own actions. I did not see him commit any offense. I had authority to arrest Mr. Irvine and take him to the city jail and confine him there, without a warrant and without any complaint against him. I made complaint against him the next morning; I couldn't make it until the next morning, because the Recorder was not there." His evidence further shows that he arrested Irvine in the evening but did not make the affidavit until next morning.

We construe the first portion of his testimony above quoted as tending only to establish an ordinance authorizing the making of an affidavit against one as a suspicious character in order to hold him during an investigation of his case. It does not tend to show the existence of an ordinance authorizing a person's arrest without a warrant on the ground that the officer considers him a suspicious character. The latter portion of his testimony above quoted is merely the opinion of the officer as to his authority and does not purport to state even the substance of an ordinance. It does not even appear to have been based upon an ordinance. It may have been his construction of the statutes and charter authorizing the city officers to arrest without warrant in certain cases. The existence and contents of the ordinance were facts to be established by proof. The proof did not bear upon those issues, but assuming them to be established Shely merely gave his opinion as to the authority conferred upon him thereby. This was only his opinion upon a question of law; such an opinion could not establish the fact—the ordinance—upon which it was based. Since there was no evidence of an ordinance justifying the arrest without warrant and since it cannot be justified either under the general statutes or any provision of the city charter, the trial court did not err in giving said charge. We are therefore of opinion that the record shows that plaintiff's arrest was unlawful.

But more must be shown to hold Joske liable therefor. Upon this subject the court charged the jury—"If you believe from the testimony that the defendant, Alexander Joske, requested or directed the officer, Joe Shely, to arrest and confine said plaintiff in jail, then you are instructed that plaintiff is entitled to recover of defendant Joske." Joske by proper assignment urges that the giving of this charge was error for the reason that there was no evidence tending to show that he "requested or directed" the arrest. Irvine was driving a delivery wagon for Joske Bros. of which Alexander Joske was a member and in the performance of his duties started out with a number of packages for delivery to various customers of the firm in the city of San Antonio. He returned at night and informed the stable man that some of the packages, the value of which seems to have been about thirty dollars, had been stolen from his wagon, and then, without informing Joske, went to his room. Very soon afterwards Alexander Joske and the stable man appeared at the

room and from that time Irvine's version of Joske's connection with his arrest, as given on his direct examination, is as follows: "Mr. Joske called out did I live there—called out my name, Jim Irvine. I answered 'yes, sir,' and he jumped up and in a very angry way asked what I did with those goods and what I had done with the money. I said: 'Mr. Joske, I lost them.' He asked me where and I told him where they had been stolen from my wagon. I don't know whether he believed my statement or not, but any way he went off and came back with two police officers, and they questioned me regarding the packages which had been lost and I told them all I knew about it; that they had been lost or stolen out of the wagon, and told them the place; some of the police officers said, 'you had better come along with us.' Captain Roberts asked me to go along and I did so. I had my coat on and we went to the stable, and Mr. Joske asked the stableman what was my condition when I came in and he said 'he was drunk.' Mr. Joske also requested Captain Roberts to ask the stableman as to my condition when I came in and the man answered that I was drunk. I told him that I was not. Then he took me to the store and went inside and looked over his delivery sheet; then we went outside the store again and Mr. Joske and the officers had a talk, and then Frank Roberts, Captain of the Police, told me I could go; and in the meantime, Mr. Joske said: 'You come to my office in the morning, but don't take your horse and wagon along.' He discharged me right there. I said 'All right.' So I went home and the next morning I showed up at the office at his request. I had some change of theirs that I had out the day before; I went up to the shipping clerk, who was the man I did my business with, and I balanced up my account with the exception of $3 that the house owed me for work, which I retained. Then I waited till Mr, Joske came and he called me into his office and said: 'Tell me what you did with those goods and I will make it as easy for you as possible—I won't hurt you'—or words to that effrct. Well, of course, it made me feel right angry with Mr. Joske to think I had stolen the goods. I answered: 'Good Lord, Mr. Joske, you don't think for a moment I stole those goods, do you?' He said: 'What did you do with them? What was done with the money?' I said: 'They were stolen out of my wagon; that is all I can tell you about it.' Then he went to the shipping clerk and asked: 'Has this man any C. O. D. money?' And the clerk said 'Yes, sir; he has got three dollars.' Then he didn't say another word, but was very angry, and jumped to the telephone and rang up police headquarters, and said: 'Send an officer here at once.' I waited till the officer came and when he did come, Mr. Joske met him and talked with him, and then called me over to one side, and with the officer he asked me about those goods being lost, and I told him just what I have already said:—that they were stolen out of my wagon. Then the officer said: 'Mr. Joske says you have three dollars of his money.' I said that I had retained three dollars for wages which he owed me. He said that I ought to pay Mr. Joske that money, and I said that I would not do so until the law compelled me, because

Mr. Joske had discharged me the night before without allowing me to make any explanation or settle up with him for the goods lost or stolen, and that I intended to keep the money. He then told me there was a law compelling me to pay it and that I had better pay it. I said that at that rate I would pay him, but that I didn't have enough in my pocket to pay him then, but that I could get it in two minutes; that I could go to my room and get it. He took me along and we went in his buggy, and as we were going along I noticed that it was about twelve o'clock, and I thought my boarding house was nearest to the store—nearer than my room—and I would go there. I was pretty sure I could catch the man I roomed with and he would save my going to my room, and we did so, and I asked him for a couple of dollars and he let me have it, and we came back to Joske's—Detective Shely and myself,—and Mr. Shely remarked to Mr. Joske that 'this man didn't go to his room for the money, but went to another man for it.' 'Well,' he says, 'I will make an affidavit against him, anyhow.' They talked together a little while and I stayed in Mr. Shely's buggy, and he came back and I said, 'what is it?' And Mr. Shely said, 'you have got to go with me; you have got to go to jail.' They put me in jail and kept me there all that evening and until ten o'clock the next morning."

Joe Shely, witness for defendant Joske, testified as to the circumstances attending the arrest as follows: "I was assistant city detective at that time. * * * I was called to Mr. Joske's store, * * * and found Mr. Joske and Mr. Irvine arguing and contending in a very boisterous way. Mr. Irvine seemed to be angry. I had a conversation with him and Mr. Joske in which Mr. Joske desired Irvine to tell him what he had done with certain goods that he had taken out the day previous and he refused to give an accounting and seemed to be in various ways very aggressive toward Mr. Joske. When I came up and commenced to talk to him he addressed me in the same manner. * *. * I told him that he couldn't abuse me; that I proposed to have him give an account of these things; he said that he didn't have to. I told him he might have to and then I told him who I was; he may not have known at the time that I was an officer. * * * Well, he studied a little bit and then there was something said about the three dollars of Mr. Joske's money. I asked him what right he had to appropriate that money to his own use. He said he was going to keep it until Mr. Joske paid him for his work. * * * I asked him what he had done with the money and he said he had it in his room on Blum street and I asked him to go up there with me. He got in the buggy with me and we went around to the Menger, around the corner of Crockett and Alamo Plaza * * *. Irvine was not arrested then; he went with me voluntarily to get Mr. Joske's money. We went around there and Irvine got out and went into a restaurant. I got out of the buggy and followed him. I saw him talking to a man and presently he came out. I saw him and the man together and the man passed him something; and he came out and got into the buggy with me and we started back to go

up Blum street and he said we would go on back. I said, 'well—let's go up to your room.' He said, no—that he had the money. I said, 'you said you had the money at your room.' 'Well,' he says, 'I have got the money now to give him.' I then told him that I wanted to know what he had done with those goods, or give an account of the things he had the evening before. He said he didn't have to. I told him that he would have to give an account of those things or go to his room or that I would arrest him, and for him to take his choice. I told that I wanted an explanation,—that I demanded it as an officer, and he positively refused to give an explanation, and I drove back to Mr. Joske's and called Mr. Joske out and told him that I was going to put Irvine in jail. I brought him down and put him in jail and made an affidavit against him. In the first place, before I went away from there, Irvine challenged me to arrest him; that was in the store in the presence of Joske and some of his clerks; he challenged me to arrest him and defied me to do it. I told him I didn't want to arrest him and Mr. Joske said he did not want to have him arrested at all, but what he wanted was an explanation or some satisfaction as to where his goods had gone to, and when I came back there Mr. Joske never advised me to arrest him or anything of the kind. I did it on my own responsibility. I told Irvine that I was an officer in the discharge of my duty, and that Mr. Joske had just turned the case over to me and it was my duty to investigate it, and that I wanted him to tell me all about it. He refused positively to do so and defied me to arrest him and put him in jail. I took him down and advised with Capt. Druse, my chief. The Captain advised me to go ahead and whatever I did he knew would be right; he said 'you are acquainted with the case and you know the law and you know your business.' When I drove back to Mr. Joske's I called him out. He did not direct me to arrest Irvine in any way at all. Mr. Joske had nothing at all to do with the arrest of the man; never advised me to arrest him; just turned the case over to me and wanted it investigated. * * * I could get from Irvine no explanation whatever in reference to the goods until after I put him in jail. After he had been in jail a while he sent for me and told me where he was playing cards, where he got drunk, and I went up there and got information. I found out where the articles were lost. He told me that he had been drunk, and every thing, and they corroborated what he had told me after he had been in jail three or four hours. The next morning after I came back I went before the recorder and had the case dismissed."

Frank Roberts, captain of police, testified for defendant, that when he was investigating the case on the evening the goods were lost, as detailed in Irvine's testimony above, "Joske did not in any way direct me to arrest or imprison said Irvine; in fact, he told me not to do so. * * * By all sorts of examinations I tried to ascertain from him the whereabouts of the missing property, and threatened to put him in jail

if he did not tell, but from his dazed condition and from his actions I became satisfied that he did not know where the goods were.

Alexander Joske testified in his own behalf to all the circumstances connected with the several transactions referred to in the testimony above, his testimony agreeing substantially with that of Capt. Roberts and Shely. He also testified that he had no intention of having Irvine arrested and told both Roberts and Shely that he did not wish to have him arrested but that he merely sent for them in order to have them as officers trace up and recover his property. He also denied that he made the remark testified to by Irvine, to the effect that he was going to file a complaint against Irvine. He further testified that he never recovered the goods and that he did not go to the police court.

W. O. Hilgers, whom we understand to have been an employe of Joske Bros., testified as to the conversation between Shely and Joske as Shely was about to leave the store the last time, as follows: "Mr. Joske said, 'I don't want anything to do with the arrest. I just want my goods that belonged to me. I positively do not want anything to do with the arrest.'"

The above is all of the testimony that we understand is material to the question under consideration.

The question for our determination may be stated thus: Is it a legitimate inference from this testimony that Joske "requested or directed" the arrest, or in other words should the trial court have instructed the jury that they could not so find therefrom? If so it is our duty to set aside the verdict—if not we have no power to do so. It is important, before proceeding to an examination of the evidence, to determine the rule of law by which the trial court should have been governed in deciding whether he would so instruct; for we are governed by the same rule in passing upon the question above stated.

In 1780, Buller, J., laid down the since much quoted and often misunderstood proposition that, "Whether there be any evidence, is a question for the judge. Whether sufficient evidence, is for the jury." Company of Carpenters, etc. v. Hayward, 1 Doug., 375.

The correctness of this proposition is generally admitted but great difficulty has been experienced in determining the exact legal meaning of the phrase "any evidence."

In 1868, Willis, J., in Ryder v. Wombwell, L. R., 4 Exch., 32, said: "It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence, even a scintilla, in support of the case; but it is now settled that the question for the judge (subject, of course, to review) is, as stated by Maule, J., in Jewell v. Parr., 13 C. B., 916 (E. C. L. R., Vol. 76), not whether there is literally no evidence, but whether there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established;" and held that plaintiff could not recover of a minor for a goblet valued at fifteen pounds and a pair of ornamental stud buttons valued at twenty-five pounds, the former being, within the knowledge of plaintiff at time

of sale, intended by the minor as a present to a third person, there being no evidence offered by plaintiff that such articles were necessaries in the particular case, and set aside the verdict and judgment in favor of plaintiff and entered a non-suit.

In Wittkowsky v. Wasson, 71 N. C., 454, the court, in speaking of the meaning of the phrase "any evidence," say, "Did it mean the slightest scintilla of evidence, or such only as that from which a jury might reasonably infer the existence of the alleged fact? The latter view has been adopted in this State and in England and, so far as my researches have extended, in other States generally."

In Hyatt v. Johnston, 91 Pa. St., 200, it is said: "Since the scintilla doctrine has been exploded, both in England and in this country, the preliminary question of law for the court is, not whether there is literally no evidence, or a mere scintilla, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established. If there is evidence from which the jury can properly find the question for the party on whom the burden of proof rests, it should be submitted; if not, it should be withdrawn from the jury."

In Baulec v. Railway, 59 N. Y., 356, the court said, quoting from Toomey v. Railway, 3 C. B., N. S., 149, that, "It is not enough to authorize the submission of a question, as one of fact, to a jury, that there is 'some evidence.' A scintilla of evidence, or a mere surmise that there may have been negligence on the part of the defendants, would not justify the judge in leaving the case to the jury;" and held that a single act of casual neglect, though admissible as evidence, as held by this court in Cunningham v. Railway, 88 Texas, 534, was not sufficient to authorize a jury to find that an employe was incompetent, and that the retention of such employe in its service after having investigated the facts connected with such act would not authorize a finding that the company was guilty of negligence in continuing him.

This court in Lee v. Railway, 89 Texas, 588, said: "To authorize the court to take the question from the jury, the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." In Mynning v. Railway, 64 Mich., 93, the rule is stated thus: "If the circumstances are such that reasonable minds might draw different conclusions respecting the plaintiff's fault, he is entitled to go to the jury upon the facts. The judge takes the case from the jury only when it is susceptible of but one just opinion." The Supreme Court of the United States have approved the rule announced in Ryder v. Wombwell, supra. Improvement Co. v. Munson, 14 Wall., 442; Board of County Com. v. Clark, 4 Otto, 278; Griggs v. Houston, 14 Otto, 553.

From a careful examination of the cases it appears, (1) that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established—such testimony in legal contemplation falling short of being "any evidence,"

and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force.

If it so determines the law presumes that the jury could not "reasonably infer the existence of the alleged fact" and "that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining, as a question of law whether the testimony establishes more. "There is, no doubt, a possibility in all cases where the judges have to determine whether there is evidence on which the jury may reasonably find a fact, that the judges may differ in opinion, and it is possible that the majority may be wrong. Indeed, whenever a decision of the court below on such a point is reversed, the majority must have been so either in the court above or the court below. This is an infirmity which must affect all tribunals." Ryder v. Wombwell, supra.

We are then called upon to determine whether the testimony in this case does more than to create a mere surmise or suspicion that Joske "requested or directed" Irvine's arrest. We think it does not, if it can be said to go that far. It shows clearly that Joske was urging the officers to ferret out and recover if possible his goods which Irvine had received and had not returned, and that both he and the officers were endeavoring to ascertain from Irvine the circumstances attending their loss, so that they might be traced. This Joske had a clear legal right to do, and we are of opinion that from the mere exercise of this right the law will not permit the inference to be drawn that he "requested or directed" the arrest, though it be conceded that but for its exercise the arrest would never have been made. It would be against reason to hold that the mere fact that a citizen has called upon the officer of the law to search for and recover his lost or stolen property will authorize the inference that he "requested or directed" the arrest subsequently made. Newell on Malic. Pros., 108, sec. 7, and authorities cited; Taylor on Ev., sec, 118, and authorities cited. The evidence would probably justify a finding that the arrest was made in Joske's presence, though it would be difficult to conclude therefrom that Shely did not fully determine upon and in legal contemplation make the arrest at the time Irvine refused to go to his room or give any explanation as to the circumstances under which the goods were lost. It would be a grave question whether any statement made by Irvine after that time would be admissible against him if on trial for a criminal offense. But if it be conceded that the evidence warrants the inference that the arrest was not made until they returned to the store and Shely had the conversation with Joske, still we are of opinion that nothing is shown to have occurred there that would warrant the inference that Joske "requested or directed" Shely to make the arrest. The conversation as

detailed by Shely, Joske and Hilgers shows the contrary, and that Shely made the arrest on his own responsibility, against Joske's request, and it is difficult to perceive just how Joske could have prevented the arrest at that time if he had seen fit to go beyond the exercise of his clear legal right to remain passive.   But if it be conceded that the jury had the right to lay out of the case the testimony of all these witnesses, then we are left without information as to the conversation, except that Irvine says that Joske said "I will make an affidavit against him anyhow."   We are of the opinion that this remark does not tend to show that Joske "requested or directed" Shely to then make the arrest, but on the contrary, if taken as true, it indicates a purpose on Joske's part to proceed in the mode prescribed by law by making an affidavit and thus placing the matter before the courts.   If this purpose had been carried out this suit for an illegal arrest could not have been maintained, though one for malicious prosecution may have been, under certain circumstances not necessary to mention here.   Mullen v. Brown, 138 Mass., 114.   Would the mere fact that Shely made the arrest immediately after leaving Joske, warrant the conclusion that the latter "requested or directed" him to make it?   We think not.   The whole case shows that Joske was pressing both the officers and Irvine to aid him in the recovery of his goods.   This he had the legal right to do.   There are no circumstances tending to show any collusion between Joske and the officers, or that he had or attempted to exercise any authority or control over them in the performance of what they supposed to be their duties, or that he, while ostensibly trying to recover his goods, was covertly seeking to procure Irvine's arrest.   There is no direct testimony that Joske "requested or directed" the arrest, and we are of the opinion that such fact cannot be reasonably inferred from the circumstances.   "An inference is a deduction which the reason of the jury makes from the facts proved."   1 Rice on Ev., sec. 36.   If the jury cannot reasonably make the deduction, the law does not authorize it. Upon the whole case, we are of opinion that the probative force of the testimony does not go beyond the point of creating a mere surmise or suspicion that Joske "requested or directed" the arrest, and that therefore, under the principles above discussed, there is not, in legal contemplation, "any evidence" of that fact.   It results that it was error for the court to give the charge complained of, for which the judgments of the Court of Civil Appeals and the trial court will be reversed and the cause remanded.

                              *Reversed and remanded.*