Pete FARNIE et al., Appellants,

v.

The FAIR STORE, Inc., et al., Appellees.

No. 6114.

Court of Civil Appeals of Texas.

Beaumont.

June 6, 1957.

Rehearing Denied Sept. 11, 1957.

A. W. Dycus, Beaumont, for appellants.

Keith, Mehaffy, McNicholas & Weber, Beaumont, for appellees.

R. L. MURRAY, Chief Justice.

This is an appeal from a judgment rendered in the district court of Jefferson County upon an instructed verdict in favor of the appellees, The Fair Store, Inc., and Elizabeth Shilling, and against the appellant Pete Farnie, suing for himself and as next friend of his minor daughter, Margaret Farnie.

Appellant Farnie brought his suit for damages suffered by his daughter, alleging negligence on the part of appellee Elizabeth Shilling as an agent, servant and employee of The Fair Store, Inc. Trial was had to a jury and at the close of the evidence in behalf of plaintiff below the trial court granted the motion for instructed verdict filed by the defendants below. The ground presented in support of the motion for instructed verdict was as follows: "Plaintiffs have wholly failed to raise any issue for the jury in connection with the allegations of either negligence or proximate cause, and there is no evidence upon which the jury could convict the defendant, Mrs. Shilling, of any act of negligence proximately causing the accident in question, or in the alternative, there is insufficient evidence upon which to base a finding of either negligence or proximate cause."

The parties to this appeal are in agreement that the only question involved here is whether there was presented to the court some evidence of a probative nature from which the jury could have found or reasonably inferred that the appellee Elizabeth Shilling was guilty of any act of negligence which was a proximate cause of the injuries to the minor child, Margaret Farnie. The appellant ably presents his contention under his one point that the trial court was in error in so instructing the jury, and the appellees also ably present their contention to the effect that the action of the trial court in this respect was proper. A summary of the evidence as presented in behalf of appellants in support of their allegations of negligence and proximate cause is therefore necessary. The appellee, Mrs. Shilling was a clerk and employee of The Fair Store, which operates a department

store in the City of Beaumont. Margaret Farnie, a little girl who was 15 years old at the time of trial in 1956, went to the store with her sister, Grace, to buy some skirts in 1953. While she was seated in a chair in a small dressing room where Mrs. Shilling was waiting on her, one skirt to be tried on was hanging on a small plastic hanger which, in turn, was hanging on a hook on the wall of the dressing room. Mrs. Shilling reached over the child's head, pulled the skirt from the hanger, and in doing so, caused the hanger to spring up from the hook and fall downward upon the child's face. A part of the hanger struck her in the right eye. Mrs. Shilling got a wet cloth and her sister wiped the eye for her and then she and her sister went to another store and bought some mercurochrome and put on the eye. The falling skirt hanger struck her and caused a small cut on the outside of the lower lid of one eye.

There is some medical testimony of serious injury to the eye and other medical testimony that there was none. We are not concerned with the question of injury on this appeal since the only question brought forward is whether there was evidence of negligence and proximate cause.

The appellants in their petition allege the following specific grounds of negligence on the part of Mrs. Shilling:

"(a) In jerking said skirt from a hanger without first releasing the clasp or device on said hanger by which said skirt was attached to the hanger;

"(b) In failing to remove said hanger together with the skirt attached thereto from the hook from which it was suspended before removing the skirt from the hanger;

"(c) In failing to warn the minor plaintiff of her intention to jerk the skirt from said hanger;

"(d) In failing to secure said hanger properly before attempting to jerk the skirt from the clamp on said hanger;

"(e) In placing a greater number of hangers on the hook from which said hanger was suspended and was safe under the conditions then and there obtaining;

"(f) In suspending said hanger from a hook upon which other hangers had already been placed."

Mrs. Rayburn, the sister of Margaret Farnie, testified in regard to the actual happening of the falling skirt hanger as follows:

"Q. You think she (Mrs. Shilling) came back again? Tell the jury if anything what happened then. A. Well, I was trying on the skirt; when she came back I was to take off that one and get the other; and at the time she jerked it down, and the hanger went up and then came down.

"Q. Where was your sister sitting? A. She was sitting underneath the skirts that were hanging up.

"Q. Describe that hanger as best you can. A. It was plastic top with metal clips.

"Q. Would you be able, if I got a blackboard would you be able to draw a rough diagram of that? A. I think so.

"Q. While he is getting the blackboard and a piece of chalk can you tell the jury approximately the size of that dressing room? A. Well, it was small.

"Q. Approximately, with reference—do you know in feet or anything like that? A. No, I don't.

"Q. Was it crowded with three of you in the dressing room? A. Yes.

"Q. Now, this hanger that we are talking about, where was it hanging? A. It was hanging over my sister, on that little hook.

"Q. On what? A. Hook on the wall.

"Q. Approximately do you know how many hangers were on that hook at the time she pulled that hanger off? A. One.

"Q. Did she have anything in her hands at the time she jerked the skirt down? A. No, I didn't see anything.

"Q. Are you telling the jury, did you actually see her jerk it? A. Yes, sir.

"Q. Tell the jury just how she went about it? A. She took about the middle of the skirt and pulled down.

"Q. Did she use both hands or one hand? A. Well, I don't know.

"Q. Could she have reached up and released the clips that were on the hanger? A. Yes, sir.

"Q. Did she do that? A. No.

"Q. Now, when she pulled on the skirt what happened to the hanger? A. It went up and came down and hit my sister on the eye.

"Q. Did it spring up? A. Yes."

On cross examination she further testified that her sister was sitting in the corner of the dressing room on a chair, and about the only place to hang the skirts was almost over where her younger sister was sitting. As to a description of the skirt hanger, she testified on cross examination as follows:

"Q. As I understand it, this was a plastic hanger; is that correct? A. Well, it had metal on it, too.

"Q. But it was a plastic coat hanger, in the sense it was— A. The top was plastic.

"Q. I assume the top was like this. A. Yes.

"Q. Then it had— A. Yes; that was plastic.

"Q. Did it have a rod going across here? A. Yes; that was metal.

"Q. That was regular coat hanger material? A. Yes.

"Q. That would be a coat hanger if you just go ahead and draw it like that. To make that into a skirt hanger, you have to have little things like clothes pins? A. Yes; those were also metal.

"Q. Those are little clips, so that— when you hang a skirt on that, do you hang it right side up or down? A. Right side up.

"Q. This (drawing on blackboard) would be the skirt, like that, with clips holding each side? A. Yes, sir.

"Q. After you get the skirt up on the hanger, what you say she did was to pull it? A. Yes, sir.

"Q. And as she pulled, this was hanging up on a hanger that comes out like that (drawing on board)—a hook? A. Yes, sir.

"Q. Then you say, after she pulled on this the hanger went up. A. Yes, sir.

"Q. The hanger didn't just fly off; it went up first? A. It went up and it came down.

"Q. It went up like that, and then dropped and hit your little sister? A. Yes, sir.

"Q. Do you have skirt hangers at home yourself? A. Yes.

"Q. Don't you know you can't always come up and undo one of those clips, but isn't it the common, ordinary, every-day thing that people do all the time; when they want to get a skirt off they just pull it down? A. I never do."

Margaret Farnie, herself, testified about the incident as follows:

"Q. What was your purpose in going with your sister? A. Well,

I was going to help her pick out some skirts.

"Q. While you were in the dressing room did anything happen? A. I don't understand.

"Q. Did anything happen while you were in the dressing room? A. You mean when she took the skirt off the hanger?

"Q. Yes. A. She tried on one skirt and the other was on the hook; it was to my left side, and when she went to take the skirt out of the hanger she jerked on it, and the hanger flew up and it came down and hit me in the eye."

Mrs. Shilling, one of the appellees, called as an adverse party witness by the plaintiffs below, testified in regard to the incident as follows:

"Q. Now, Grace had selected some skirts, is that correct? A. Yes, sir.

"Q. Can you tell the jury approximately what is the size of those dressing rooms? A. No; it is small.

"Q. It is small? A. Yes, sir.

"Q. Would there be room to get, say, six people in there? A. No.

"Q. Would you say that you were crowded with three people in the room—with you and the two girls, were you all crowded? A. Yes.

"Q. And the little Margaret was sitting in a chair; was it directly under the coat hanger, or the hanger that fell? A. I don't recall where she was sitting.

"Q. Do you remember how many of the hangers that you had in that room? Mr. Mehaffy has drawn something on the board, something to hang the hanger on. Do you recall how many there were in there that day? A. You mean how many hooks?

"A. Yes. A. One.

"Q. You don't remember where the chair was, in respect to the hook; is that correct? A. No.

"Q. Approximately what is the length of that hook? Would you be able to tell us? A. No, I wouldn't.

"Q. Would it be able to hold three items or four items that were on hangers comfortably? A. It would hold three, but not four.

"Q. Now, that day how many items did you have on the hook at the time that you pulled this skirt? A. I don't recall; it has been so long ago. Two or three—I don't know.

"Q. What item was she trying out? A. Skirts.

"Q. Anything else? A. Well, she had mentioned sweaters and blouses, but I don't recall whether she tried those on or not.

"Q. Well, did you have the blouses and sweaters with you in your arms at the same time? Do you recall? A. No, I don't.

"Q. Now, the deposition that you gave on the 15th of February, 1956— do you recall giving that deposition? A. Yes.

"Q. Before Mr. Waldman; and there was a Court Reporter taking the testimony? A. Yes, sir.

"Q. The question was, 'What did you bring in and hang up there? Answer: Skirts and blouses and sweaters. Well, I didn't hang the sweaters; I held those.' 'Question: But she was trying on skirts and blouses and she was also trying on or going to try on some sweaters? Answer: Yes, sir.' 'Question: All right, now, what did you hang up there then? Answer: Blouses and skirts.'

"Q. Is that right? A. Yes, sir.

"Q. You had three skirts; do you remember how many blouses? A. No, I don't.

"Q. I notice you use the word 'blouses.' Do you mean more than one blouse? A. Yes, sir.

"Q. Would they also be hanging from a hanger? A. Sometimes, yes.

"Q. Do you recall how many skirts and blouses were on this hook, hanging on the hangers just before you pulled the skirt off? A. No, I don't.

"Q. Did you have too many on those coat hangers on that hook that day, one of the reasons that that came off, that coat hanger came off? A. May have been.

"Q. Of course, as Mr. Waldman said, we are not trying to say that you intentionally did this, but merely that you were careless. Now, the question was by Mr. Waldman on page 13: 'Now, if you had—'

"Q. The question that was asked by Mr. Waldman on that day: 'Now, if you had—and again bearing in mind, and I'm not trying to, you know, say that you intentionally did it at all—but if you had released—.' "

"Q. The question, 'Now, if you had—and again bearing in mind I am not trying to, you know, say that you intentionally did it at all—but if you had released those clips instead of pulling them down, then the coat hanger would not have been jerked then would it?' And the answer was: 'Well, if there hadn't been so many on the rack, it probably wouldn't have fallen.' Is that correct, that there were too many on the rack? A. There were three.

"Q. Was that too many, under the circumstances? A. I don't know. It had fallen before. It was just an accident.

"Q. Let me ask you this: That coat hanger—or that hanger—skirt hanger, has clips on it, on the rod down here at the bottom? A. Yes, sir.

"Q. And those clips are situated on each end as reflected by this diagram? A. Yes, sir.

"Q. And speaking of the particular hanger on August 3, 1953, what is this rod made of? A. Metal.

"Q. And this? A. It was plastic when I worked there.

"Q. What was this? A. Wood.

"Q. And what was this? A. Metal.

"Q. The metal, was that iron? A. Like an ordinary coat hanger, except it had clips on the end.

"Q. This top part of this hanger was made out of iron that you could bend, and if you pulled down suddenly it would shoot up; is that correct? A. I don't know. I don't remember it shooting up; it happened so fast.

"Q. But these clips were placed on each end, and had places on these clips you could mash and release the skirt; is that correct? A. Yes.

"Q. As I understand it, that day you took this particular skirt off, you did not release these clips, but you pulled this out of the clips; is that correct? A. I wasn't able to reach the clips, because Margaret was there and I couldn't run over her to get to it.

"Q. So then you were in an awkward position and you jerked and pulled that skirt out without releasing the clips? A. I gave it a slight pull.

"Q. And did it release the skirt? A. Yes; the clips are not very stiff.

"Q. But they are stiff enough to where they would hold a skirt; is that correct? A. That's right.

"Q. Now, had you been able—had you have released these two clips on each side, this hanger never would have fallen, would it? A. It may have.

"Q. It was not a custom of the Fair Store for you take skirts off a hanger of this sort by pulling? That was not a custom there, was it? A. Well, I had done it before.

"Q. Speaking of the other employees, they had even had instructions not to do that, for fear it might tear the fabric; isn't that correct? A. I don't remember getting any instructions.

"Q. Did you always and as a habit and custom, rather than release the clips, jerk it off? A. If I didn't have it in my hand, the hanger—couldn't get to it—I gave it a slight pull.

"Q. Now, you were in this small room where you say it would be crowded with six people? A. They might get in, but it would be crowded.

"Q. It was crowded with three people? A. Yes, sir.

"Q. I'll ask you when you jerked the skirt, how far were you away from Margaret, the little girl that got hit?

"Q. When you gave the skirt a slight pull, about how far were you from Margaret? A. Not too far, because the room isn't very large.

"Q. You don't know where she was sitting in respect to the hook that had the hangers on it? A. I don't recall.

"Q. I thought you testified a while ago Margaret was in the way? A. I don't remember exactly where she was sitting in the chair.

"Q. Now, you have seen from common knowledge, that coat hangers of this nature, with the metal top on them, if you give them a pull, they will likely fall off, or would probably fall off of the hook; isn't that correct? A. Not always.

"Q. But you have seen it happen? A. Yes.

"Q. And you can reasonably anticipate that, with this room crowded, that just jerking this skirt—A. I didn't jerk it.

"Q. Well, pulling this skirt loose without undoing these clips, that this coat hanger could fall to the ground? A. It might.

"Q. And you could reasonably foresee that it would or that it could fall to the ground? A. Yes.

"Q. And it had done it on other occasions? A. Yes, sir.

"Q. And in those instances it had done it before would be in the dressing room, where you had people sitting in a crowded area or could be in the large room where if it did fall down, of course, someone might not get hurt? I mean these other times that happened. Is that correct? A. Would you mind re-stating that?

"Q. Other times I believe you testified you had had one of these hangers to fall to the floor when you pulled a skirt or something like you did in this instance; on other occasions the coat hanger had fallen to the floor likewise; is that correct? A. Yes.

"Q. However, in those instances where you did that maybe out in the department where there weren't too many people around you; isn't that true? A. What do you mean by that?

"Q. Isn't it a fact that you pulled that skirt off, knowing that this hanger could fall off like it did and that was in a small, confined room; isn't that right? A. No, I didn't know they would fall.

"Q. You had seen them fall off before, hadn't you? A. Yes, sir.

"Q. And they had done it when you would pull the skirt like you did this day? A. Sometimes they have fallen off and sometimes they haven't.

"Q. But what I am getting at is that in a room that small, knowing that they could fall when you pulled the skirt the way you did, a person could reasonably foresee that in a small area like that that something of this sort could happen—that is, hit her on the arm, foot, head, or anywhere, couldn't they? A. They might.

"Q. Had you in this instance gone over and released those two clips, that is, mashed them and taken the skirt out, the hanger never would have fallen? A. I don't know.

"Q. Well, it was rather secure up there, wasn't it? The hanging part was on the hook? A. Yes, sir.

"Q. In other words, it was a combination not only of what pulling this skirt down without unhooking these, but also by having too many hangers on this hook; those were the two factors which caused this incident; isn't that true? A. Yes, sir.

"Q. Likewise, if you had only had one hanger on the hook, or two hangers, then in all probability that would not have fallen? Or could you say that? A. No, I can't say that, because things might fall, no matter how much you have on there."

In reviewing the trial court's action in instructing a verdict for the defendants below, we must appraise the above evidence in behalf of the plaintiffs below in the light of the following pronouncement by our Supreme Court in Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791, 794, quoting from Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059: "It is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'."

We think the evidence produced in behalf of the appellants goes no further than to raise a mere surmise or suspicion that Mrs. Shilling was guilty of any negligence in pulling the skirt off the hanger in the manner shown by the evidence, or that, if such act was negligence, such act was a proximate cause of the injury to the little girl. We are unable to see how Mrs. Shilling, or any ordinarily prudent person in a similar situation, could have reasonably anticipated that the falling of the small plastic hanger, weighing only a few ounces, and falling only two or three feet, would naturally and probably result in injury to anyone. It seems to be well established in our jurisprudence that foreseeability is a necessary and indispensable element in a legal concept of proximate cause.

We find no error in the trial court's action in instructing a verdict and the judgment is accordingly affirmed.