**A. W. HUTCHINGS et al., Appellants,**

**v.**

**Hal ANDERSON et al., Appellees.**

**No. 17390.**

Court of Civil Appeals of Texas, Dallas.

Feb. 20, 1970.

C. L. Mike Schmidt, Akin, Vial, Hamilton, Koch & Tubb, Dean Jorgenson, Gallagher, Wilson, Berry & Jorgenson, Dallas, for appellants.

George E. Seay, Jr., Touchstone, Bernays & Johnston, Dallas, for appellees.

CLAUDE WILLIAMS, Justice.

In three separate actions A. W. Hutchings, Orville W. Erringer, Ralph T. Dosher, and James Hultgren sued Hal Anderson, individually and d/b/a Hal Anderson Properties, Pickwick Lane Corporation,

Charles Jennings, Intercontinental Realty Corporation, and Frymire Engineering Company, Inc. seeking to recover damages for loss or destruction of personal property caused by water flooding of a basement of the Royal Orleans Apartment in Dallas, Texas. The three suits were consolidated. The defendant Intercontinental Realty Corporation was dismissed.

The case proceeded to trial before the court and a jury and at the conclusion of the presentation of evidence by the plaintiffs the court sustained motions for peremptory instruction filed by all defendants, except Jennings, who defaulted. The court thereafter rendered the following judgment: (1) That the cause of action asserted by A. W. Hutchings be dismissed, for want of prosecution; (2) that a default judgment be rendered in favor of plaintiffs Dosher, Hultgren and Erringer against the defendant Charles Jennings, for the sum of $6,558.45, and (3) that plaintiffs Dosher, Hultgren and Erringer take nothing by reason of their suits against Hal Anderson, individually and d/b/a Hal Anderson Properties, Pickwick Lane Corporation and Frymire Engineering Company, Inc. Only Erringer, Dosher and Hultgren have perfected an appeal from this judgment.

Appellants in two points of error, contend that the record demonstrates evidence of probative force to establish acts of negligence and proximate cause against each or all of the appellees so that the trial court erred in withdrawing the case from the jury and rendering judgment against them. Appellees, in countervailing points, contend that appellants wholly failed to introduce any evidence of probative value which would justify the submission to the jury of any issues of negligence and proximate cause as against appellees and that the trial court was correct in holding, as a matter of law, that the loss and damage to the personal property in question was caused solely by an act of God in the form of unprecedented rainfall.

Since the propriety of the action of the court in granting the motions for instruct-

ed verdicts depends upon the existence of any evidence of negligence and proximate cause we have carefully reviewed the entire statement of facts in the light of the well established rules of judicial review of directed verdicts. The material facts developed by appellants' evidence may be summarized, as follows:

The Royal Orleans Apartment House is a two-story building of twenty units and located immediately north of Northwest Highway in the City of Dallas. A brick wall, commonly referred to as the "Pink Wall" separates the Royal Orleans Apartment House, as well as other apartment houses in the area, from Northwest Highway. The building was completed during 1964. The Pickwick Lane Corporation, a corporation set up by Hal Anderson, built the building with Charles Napper as general contractor and Charles Jennings as the architect. The building was constructed in accordance with the plans and specifications furnished to the contractor by the architect. No attack was made upon the professional ability of either the contractor or the architect. Beneath the ground level and below the apartment units was a basement area 151 feet long, 128 feet wide and from 8 to 10 feet high. To gain entrance into the basement area there was a concrete ramp from the street level leading into the basement. To exit therefrom another ramp on the other side of the basement had been constructed. Both the entrance and exit ramps were open to allow automobiles to be driven into and from the basement area. Parking spaces for automobiles were provided in the basement area for tenants of the building. Also, in the basement area storage units for tenants had been constructed and affixed to the wall. Each of these units was 4 feet high, 3 feet wide and 2 feet deep with the bottom of the unit being 4 feet from the basement floor. To prevent the entrance of water flowing into the ramps and down into the basement area there had been constructed at the top of each ramp a "threshold" or depressed area designed to cause water to flow away from the ramp en-

trances. There were two "box drains" crossing the ramps, each drained by a 4-inch pipeline. The drainage area was directed towards a drainage ditch behind the building which flowed into a city sewer that went through the "Pink Wall" and on into Northwest Highway where excess water was to flow away. To make provision for any water that might drain into the basement from the ramps, or any other excess water that might accumulate in the basement, the builder had constructed what is known as a "sump" which is a hole 3 feet wide and 5 feet deep located at about the center of the basement area. The hole or "sump" was covered by an iron grating which was level with the concrete floor of the basement area. In this sump was placed a "sump pump" which is a pump designed to carry water to a higher level where there is no gravity available to dispose of the water. This pump, electrically operated, was affixed near the bottom of the 5-foot sump. Throughout the basement were located six 4-inch drainage pipes, all leading into the sump. From the sump itself there was located a 3-inch discharge pipe which was laid up through the ceiling of the basement, on out under the ground, and leading to the drainage ditch which ran through the "Pink Wall" and into Northwest Highway. The sump and sump pump were so designed and constructed that when excess water would accumulate in the sump to a height of about 2 feet the pump itself became activated by means of a float system. Then the pump would cause the water to be forced out under pressure into the 3-inch drainage pipe and on out into Northwest Highway. The sump pump had a capacity of 125 gallons per minute. In connection with the sump pump there was installed in the "same area" an alarm bell electrically operated which was designed to become automatically activated when water accumulated in the sump to within a foot of the top of the pit. The sump pump motor was not the submergible type which would operate under water so that when water would accumulate over the pump it would short out and stop. At the same time the alarm bell would be shorted out and become ineffective also.

The testimony concerning the details of the installation and operation of the sump pump came primarily from the witness Lee Henderson, plumbing superintendent for Frymire. He testified that Frymire furnished and installed the sump pump but that the electrical contractor on the job had charge of the installation and connecting of the alarm system to the sump pump. No testimony was elicited from the electrical contractor. Henderson testified that at the time of the installation of the sump pump it was tested and found to be working satisfactorily. He did not make a test of the alarm system since that was not his duty. He testified he had never heard the alarm system operating. At the time the building was completed and turned over to the owner in 1964 the sump pump was operating correctly and since that time he had heard no complaints concerning the operation thereof. As to the inspection of the pump it was not his duty to do so as he had nothing whatever to do with that phase of the business. He said that the city inspector approved the installation of the sump pump; that the same was installed in accordance with the plans and specifications provided by the architect, and that Anderson relied on Frymire to see that the pump was installed properly. He further testified that the sump pump was designed to carry off and dispose of volumes of water normally expected to accumulate in the sump.

As to the incident in question he calculated that from twelve to fourteen million gallons of water had accumulated in the basement and that, in his opinion, it would have had to be a tremendous "wall of water" that came rushing into the basement at one time for it to have shorted out the pump and the alarm bell. He said that if the water had flowed into the basement in a normal manner the sump pump would have been able to pump it out of the building.

There was introduced in evidence a written service agreement between Hal Anderson and associates and Frymire Engineering Company, Inc., whereby Frymire, for a monthly payment, agreed to inspect and maintain certain equipment specified in the contract including: "1–Weil #BSA1 Simplex sump pump with one 1½HP three phase motor for storm and area drainage use." Frymire admitted that they had never made an inspection of the pump.

No evidence was introduced concerning inspection of the electrical warning system. There was testimony that there were no warning signals located in any of the apartments leased to tenants, or the manager's apartment, the only bell being located near the sump pump itself in the basement. No one testified that they ever heard the bell ring.

Samuel J. Easley, meteorologist, in charge of United States Weather Bureau, Love Field, Dallas, testified that he has been in charge of the weather record for thirty years and kept and maintained such records at Love Field covering the total rainfall during the month of April, 1966. This total reached 15.40 inches, being a record for the history of the Weather Bureau in Dallas. Prior to April 28, 1966 seven storms had occurred within the preceding two weeks leaving the ground well saturated and the storage areas completely full. During the early morning hours of April 28, 1966 a record-breaking rain fell, to-wit: twelve o'clock to one o'clock, .51 inches; one to two, 2.20 inches; two to three, .73 inches; three to four, .01 inches; four to five, .07 inches; and five to six, .03 inches. According to a localized map recording the rainfall in specific parts of Dallas, the nearest measuring station to the Royal Orleans Apartment measured from 4.4 inches to 4.8 inches of rain falling between midnight and four A.M. on April 28th. The principal portion of this rain fell between one and two A.M. that morning. The rains fell with about the same intensity during the one-hour period between one and two A.M. Seven lives were lost in the northern part of Dallas and property damage to highways and bridges amounted to more than two million five hundred thousand dollars in the north part of Dallas.

Mrs. Dosher, wife of one of appellants, and a tenant in the Royal Orleans Apartment building, testified that the first information she received about flooding in the basement of the building was at six A.M. on April 28, 1966, when Mrs. Irwin, the manager, came to her door and advised her about the condition. She said her apartment was located in the center of the building on the east side and down the hall from Mrs. Irwin's apartment. Prior to six A.M. no one connected with Hal Anderson warned her that the basement was flooding. After Mrs. Irwin awakened her at six A.M. she walked to the door going down into the basement and could see that the water in the basement had almost reached the ceiling. She went over to the Preston Towers Apartment nearby and stayed for several hours during which time she overheard conversations concerning efforts that had been made by employees to relieve flooding situations in the basements of other buildings but not the Royal Orleans. She testified that she never at any time heard the warning bell. She said Mrs. Irwin related to her that she did not hear a bell ring.

Gil Anderson, formerly with Hal Anderson Properties, and in charge of the operation of the Royal Orleans in April of 1966, testified that on that occasion Mrs. Irwin was resident manager. Mrs. Irwin called him at home about five-thirty A.M. on April 28, 1966 and advised him that the basement of the building was then completely flooded; that he went to the building immediately and found the basement to be filled entirely with water. The water was level with the entrance to the ramps leading into and from the basement. A torrential rain had fallen earlier in the night. A day and a half's time was required to pump water out of the basement. He testified that the ramps were so con-

structed that normal rainfall would not cause an excess amount of water to come into the basement from the street and that the sump pump, located in the center of the basement, had always worked properly and taken care of the normal amounts of water. He said that he did not hear Mrs. Irwin or anyone else tell him that they had heard the alarm bell, located near the sump pump in the basement, ring at any time that night.

After all of the plaintiffs had closed their testimony the trial court made the following statement:

"I want to also find in this record that the uncontroverted evidence in this case is that this was the heaviest rain that Dallas had ever experienced in the one hundred year or so history of the Love Field or Dallas Weather Bureau records and that not only was this particular rain this night of April the 28th unprecedented in the history of Dallas, so far as the records go, but it came near the end of a series of ten days or eleven days of additional or earlier exceedingly heavy rains, one of which amounted to as much as two inches, one day before this April the 28th occurrence, and as a result of this being an unprecedented heavy rain, I find that the minds of reasonable men could not differ than that the only believable evidence in this case is that it was an unavoidable occurrence because of an Act of God, and that the unprecedented heavy rains was the sole proximate cause of the occurrence in question. I also further find * * * no proof of any act of negligence, no proof of any negligence, and no proof of any proximate cause of any act of negligence which resulted in the damage, and for all these reasons, I withdraw this case from the jury."

All parties agree both in briefs and in oral argument before this court that the unprecedented rainfall on the occasion of April 28, 1966 was an act of God and resulted in both loss of life and exceedingly heavy property damage in the area near the Royal Orleans Apartment.

■ It is established in our law that damages resulting from an act of God are not ordinarily chargeable to anyone. However, for a defendant to be relieved of liability for an unprecedented flood there must be no negligence on his part concurring with the acts of God to cause the damage. Luther Transfer & Storage, Inc. v. Walton, 156 Tex. 492, 296 S.W.2d 750 (1957), and cases cited therein.

■ No lease agreements between any of the appellants and appellees were introduced in evidence in this record. Accordingly, if appellants were tenants of Hal Anderson on the occasion in question, the law says that they took the premises as they found them under the doctrine of *caveat emptor*. 35 Tex.Jur.2d, § 110, p. 606. In the absence of a nuisance per se, the duty of the owner of the building in providing for its safe construction is satisfied by the use of ordinary care to engage a competent architect and builder. Hamblen v. Mohr, 171 S.W.2d 168 (Tex.Civ.App., Galveston 1943, writ ref'd w. o. m.). In the light of these rules of law we turn now to a consideration of appellants' contention that the evidence reveals facts sufficient to require the trial court to submit issues of negligence and proximate cause against appellees.

■ Appellants first say that there was evidence of probative force to the effect that Anderson and Pickwick were negligent in failure to give warning to appellants that water was entering the basement. While it is true that, in the absence of a contractual arrangement, there was no duty on the part of the landlord to give any warning to tenants, yet it is also true that having assumed the duty to warn, the landlord is under an obligation to perform that duty in a reasonable and prudent manner. It is undisputed in this record that Anderson selected a careful and prudent architect to prepare plans and specifications for the construction of the building

and basement. These plans and specifications included the installation of the sump pump and warning bell described in the summary of the evidence above. It is not controverted that Anderson selected a careful and prudent contractor to carry out the plans and specifications. All of the evidence is to the effect that the sump pump was adequate to meet ordinary requirements of disposition of excess water in the basement area. As to the alarm bell the evidence is very meager. There is no testimony from the person installing the bell as to its exact location, its volume, and whether it could have been heard by the tenants had it sounded on the occasion in question. There is no evidence that the manager or any of the tenants heard the bell if it did ring on the occasion in question. Neither is there any evidence that it did not operate on that occasion. The burden was upon appellants, as plaintiffs in the trial court, to introduce competent evidence to demonstrate that had the bell alarm sounded properly the tenants would have had ample opportunity to have reacted to save their property from damage or destruction. To the contrary, the only evidence introduced demonstrates an unprecedented rainfall in the period of one hour between one and two A.M. which caused a veritable wall of water to fall and flow into the basement and undoubtedly filled the same to the ceiling within a short period of time. Furthermore, there is no evidence that appellees, or their agents, had knowledge of the unusual flooding until several hours after two A.M., which would have been after the basement became flooded. We are of the opinion, and so hold, that the evidence introduced by appellants, plaintiffs below, raised nothing more than a suspicion or surmise, and certainly not being more than a scintilla of evidence, concerning the issue of failure to warn and proximate cause. This was not sufficient to justify the submission of an issue on such questions. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059 (1898).

■ Next appellants contend that Anderson and·Pickwick were negligent in failing to provide adequate outside runoff for rain water. There is no merit to this contention. The evidence again demonstrates that the building, together with drainage conduits, both inside and outside, were constructed by a competent contractor in accordance with the plans and specifications provided by a competent architect. Anderson and Pickwick had a perfect right to rely upon the architect and the contractor to perform these services. The evidence demonstrates that adequate drainage facilities were provided to carry off the water ordinarily expected to fall on the area. Again we say that the record reveals nothing more than a suspicion or surmise concerning the inadequacy of the outside drainage and therefore would not have justified the trial court in submitting an issue on such questions.

As to appellee Frymire Engineering Company, appellants contend that such company was negligent in failing to provide an alarm system and in failing to maintain and properly check the sump pump periodically pursuant to contract. In the first place, the contractual arrangement between Frymire and Hal Anderson was purely personal between these parties and not one for the benefit of third parties, including appellants. Moreover, the evidence is conclusive that Frymire had no part in the installation and wiring of the alarm system, same being installed by the electrical contractor. Appellants offered no testimony concerning this installation or maintenance of the electrical system. There was no evidence as to whether the alarm bell sounded or did not sound on the occasion of the heavy rainfall about two A.M. that morning. As to the inspection of the sump pump the testimony is clear and convincing that Frymire received no reports of complaints concerning the operation of the pump after it had been originally installed and tested. Above all this, it is quite apparent from reading this record that regardless of the condition of the sump pump the sudden and unexpected flood of water falling within a period of one hour which surely filled the basement

quickly was an act which could not have been combatted by an ordinary pump designed and constructed to take care of ordinary amounts of excess water. Such event could not have been reasonably foreseen or anticipated by a person of ordinary care and prudence.

■ We are convinced that the record in this case is devoid of any evidence of probative force to support the submission of any issue to the jury concerning negligence and proximate cause as against any of appellees. The trial court was correct in his finding that the sole proximate cause of the loss in question was the unavoidable occurrence flowing from the act of God in the form of a sudden and unprecedented downpour of rain.

All of appellants' points of error are overruled and the judgment of the trial court is affirmed.

Affirmed.