**Ralph E. COX et al., Appellants,**

v.

**Corky J. W. HEDGES et al., Appellees.**

**No. 3588.**

Court of Civil Appeals of Texas.

Eastland.

March 10, 1961.

Rehearing Denied March 31, 1961.

Beckmann, Stanard, Wood & Vance, San Antonio, Keys, Russell, Keys & Watson, Corpus Christi, for appellant.

Robert D. Nogueira, Beeville, for appellee.

GRISSOM, Chief Justice.

A little more than a month before February 20, 1959, James Harris arrived in Beeville and obtained employment with L. D. Bennett at his oil and gas service station. Harris sold oil and gas and made minor repairs on automobiles. About three weeks after Harris was employed by Bennett, Bennett learned that he was under the influence of intoxicating liquors while on the job and discharged him. They remained on good terms and Harris was frequently at his station thereafter. Nine days prior to February 20, 1959, Harris was hired by Cox and Crossley, who were engaged in selling and repairing automobiles, and he was then being tried out as a mechanic. Soon after Harris was employed by Cox and Crossley, that firm acquired a "souped-up hot rod" Mercury which attracted the attention of all the mechanics. About February 14th, Harris began planning to buy it. He drove it to Bennett's station and talked to him about the Mercury because Bennett had known the car when it was in the hands of a former owner and before the motor was changed. During the week which ended on Saturday, February 21st, Harris drove the Mercury several times. It is undisputed that he drove it one time with the knowledge and consent of Mr. Cox, the manager,

but he was then driving it to determine whether he wanted to buy it. He had done some work on the Mercury.

On the night of February 20th Harris drove the car to Bennett's station and to May's Drive In. The accident that caused this suit occurred that night a few minutes after midnight. Harris remained in May's Drive In from about ten-thirty until just before midnight when he and Cagle, who was stationed at a naval base near Beeville, left the drive in and he volunteered to take Cagle to his base so that he would not have to ride a bus. After Harris had driven about 9/10ths of a mile from May's Drive In toward the naval base, he arrived at the scene of a minor automobile accident near which were standing officers and enlisted men of the United States Navy, jet pilots and instructors and marine aviators. Some of them had parked a Ford near the scene of that accident and had gone to it for the purpose of rendering aid. Harris was under the influence of intoxicating liquors. He drove his employers' Mercury off the main traveled portion of the highway, struck the parked Ford and knocked it a considerable distance into the assembled crowd, injuring many of them. Harris was killed. This suit for damages was brought by Lieutenant Hedges and others, who were thus injured, against Cox and Crossley and against Lacey, who was in the automobile business in a neighboring town and had some business connection with Cox and Crossley and the Mercury involved in the second accident, and, also, against the administrator of the estate of Harris, deceased. In a trial to the court, judgment was rendered for all the plaintiffs except Cagle, who was a guest in the car driven by Harris. All defendants except Harris' administrator have appealed. The judgment was based upon the court's findings that Harris at the time of the accident was acting within the course of his employment and that the Mercury was then entrusted to him by his employers.

Appellants present many points. After a long and thorough study of a large record, we have concluded that it is necessary only to discuss the points that there is no evidence of probative force to sustain the trial court's findings that Harris was (1) acting within the course of his employment or that defendants (2) negligently entrusted the automobile to Harris at the time of the accident and, incidentally, their alternative contention that the evidence is insufficient to support said findings.

It is undisputed that no one with authority expressly authorized Harris to drive the Mercury at the time of the accident. It is undisputed that on the night of the accident Mr. Cox, who was the manager of Cox and Crossley, left the Mercury parked in front of the Cox and Crossley garage with the keys in it, or immediately available, for the sole purpose of having Pope, the main night mechanic, whose hours of work commenced when Harris' ended at 9:00 p. m., adjust the linkage in the transmission, so that it might be delivered to a purchaser the next day.

Cox left the car parked in front of the garage about 7:00 p. m. Until the afternoon of February 20th, Harris had definitely planned to buy the Mercury. The sources which might have financed his purchase turned him down and Mr. Cox on that afternoon sold it to another person, with the understanding that such person would take it after the transmission had been adjusted. The purchaser was to get the repaired Mercury the next day and the following morning he appeared at Cox and Crossley's garage to get the car. Cox told Harris to tell Pope to repair the transmission that night. Pope was advised by the work list, and perhaps also by Cox, to do the transmission work on the Mercury that night. Harris knew these things.

Harris' working hours were from ten a. m. until nine p. m. The mechanics were employed on a commission basis. On some occasions mechanics had returned after their working hours to complete a job. It was customary for a mechanic who had re-

paired a car to road test it in the day time. Cox, the manager, had instructed them not to road test a car at night. It is undisputed that Harris was not a master mechanic; that he could not do intricate mechanical repair work; that he did not know how to adjust the linkage in the Mercury transmission and that he had been working as a mechanic for Cox and Crossley only nine days at the time of the accident. There is evidence that when he thought he was going to buy the Mercury he asked Mr. Cox if Cox and Crossley would have the transmission adjusted if Harris bought the Mercury and stated that he did not know how. There is no evidence that he was capable of adjusting the linkage in the transmission.

Appellees made a determined effort to show that the automobile was entrusted to Harris, or that he was in the course of his employment at the time of the accident, by introducing evidence that no one else adjusted the transmission; that the defect in the transmission kept the Mercury from attaining its maximum speed; that Harris was driving very fast at the time of the accident, as disclosed by the force with which he struck the parked Ford and thus, by process of elimination, show that on the night of February 20th Harris repaired the transmission, from which they would infer that he was, after midnight while taking Cagle back to his naval base, actually road testing the Mercury and had authority to do so, and was, therefore, in the course of his employment, or that it was then entrusted to Harris by Cox and Crossley.

Mr. Bennett, appellee's witness, testified that on the night of the accident Harris was at Bennett's station between nine and ten; that he was looking for his laundry that a Mexican woman was supposed to leave there for him but that the laundry was not there; that Harris had then been drinking; that Harris told Bennett he had been working, that it was time to get off and that he was going back and close up, "or something to that effect". Bennett testified that he closed his station at ten o'clock and went to May's

Drive In; that when he arrived at May's shortly after ten, the Mercury was parked outside and Harris was inside and that Harris remained there until Bennett left about five minutes before midnight and that, while at May's, Harris told Bennett the finance company had turned him down and he had not bought the Mercury.

Miss Teresa Rendon, appellees' witness, testified that Harris drove the Mercury to May's about 8:30 on the night of February 20; that he drank some coffee; that she had talked with Harris about trouble with her car; that he then picked up her automobile and drove it away and returned it at about 10:30. She testified that the Mercury was in front of May's Drive In from about 8:30 to about 10:30, when Harris returned her repaired car, and that Harris was in May's restaurant from about 10:30 to nearly midnight, when he left with Cagle. Plaintiffs' evidence shows conclusively that Harris was in May's Drive In from about 10:30 until approximately midnight and that when he left he got in the Mercury and started to take Cagle to his base. Miss Rendon testified that when Harris returned her automobile about 10:30 she paid him $14.75 for installing a voltage regulator on her automobile, which included $1.80 for Harris' labor.

There is evidence that Mr. Cox said at the hospital, about forty-five minutes after the wreck, that "the boy didn't own the car. He had it out trying it out". Cox denied making the statement. But, we must assume that he did. What did such statement mean? Does it mean that Cox was admitting that he had on that night entrusted the car to Harris, or that Harris was acting within the scope of his employment when taking his friend Cagle home after midnight? It was three hours after Harris' working hours. He had been in May's for an hour and a half. The Mercury had been left by Cox in front of the garage, with the keys handy, for the sole purpose of having Pope repair the transmission so the car could be delivered to the purchaser the next day. All the evidence shows Cox was elated

by the sale and wanted to dispose of the car quickly. The only reasonable conclusion that may be drawn from all the evidence is that when Harris knew Pope was not going to repair the car that night and that an airbase mechanic was the only man left at the garage, Harris simply took it without permission.

It is undisputed that Pope, the night mechanic, who was instructed to repair the transmission on the Mercury, relieved Harris as a mechanic at the garage before nine o'clock; that although Pope's working hours began at nine he wanted to be relieved from work that night because a friend at the naval base was being transferred and he wanted to be with him; that he appeared at Cox and Crossley's about 8:30; that Harris was sweeping; that Pope called Mr. Cox, in whose home he lived like a member of the family, and obtained permission to be relieved from work that night, provided he could find a suitable substitute; that Harris suggested a mechanic by the name of Huse and, at Pope's request, Harris talked to Huse over the telephone and Huse agreed to come to the garage and take Pope's place as night mechanic; that Harris then left the garage and Pope agreed to join Harris at May's for a drink when Huse arrived to take Pope's place; that when Huse arrived Pope went to May's Drive In and drank a bottle of beer with Harris.

There is no evidence that Harris had then repaired the transmission. We think it is not shown that Harris, or anyone else, ever repaired the transmission. There was evidence that shortly before the night of the accident the Mercury was "tried out" with the defective transmission and that it developed a speed of 90 miles per hour in 100 yards; that it took off so fast that it "burned rubber" for 75 feet. Though the Mercury must have hit the parked Ford with great force, it is evident that it could have done so without the transmission having been repaired. The evidence certainly did not show the contrary. There is no genuine basis for a conclusion that on the night of the accident Harris repaired the transmission, from which fact, if it existed, appellees would imply Harris had authority to road test the Mercury that night and from which they would infer that Harris was actually road testing the automobile, after midnight, on the road to the naval base where Harris was taking his friend Cagle. Cagle was a plaintiff but he did not testify.

We sustain appellants' points that there is no evidence of probative force that Harris was either acting within the scope of his employment or that the Mercury had been entrusted to him at the time of the accident. The evidence offered to prove the vital facts that at the time of the accident Harris was in the course of his employment, or that the Mercury was then entrusted to him, is so weak that, at best, it does no more than create a surmise or suspicion of the existence of either. The evidence thereof constitutes no more than a mere scintilla. We conclude that the rule stated in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, must be applied. The evidence does not raise said issues and, in addition, we believe it shows conclusively that at the time in question the Mercury had been left in front of the garage by the Cox and Crossley manager, with the keys handy, for the sole purpose of having Pope adjust the linkage in the transmission so that it could be delivered to its purchaser the next day.

We understand the rule that a finding of no evidence includes the lesser finding that the evidence is insufficient to sustain the verdict. However, in the event it should be held that we are wrong in our conclusion that there is no evidence of probative force to support such findings, we find that the evidence is insufficient to sustain them. See Barker v. Coastal Builders, 151 Tex. 540, 271 S.W.2d 798, and Judge Calvert's article in 38 Texas Law Review 361.

The judgment is reversed and judgment is rendered for appellants.